927 A.2d 32

**John Otha DICKENS, Sr.**

v.

**STATE of Maryland.**

**No. 1739, Sept. Term, 2005.**

Court of Special Appeals of Maryland.

July 2, 2007.

---

Julia Doyle Bernhardt (Nancy Forster, Public Defender on the brief), Baltimore, for appellant.

M. Jennifer Landis (Douglas F. Gansler, Attorney General, on the brief), Baltimore, for appellee.

Panel: SALMON, ADKINS, MEREDITH, JJ.

SALMON, J.

John Dickens, Sr., was married to Darlene Dowsey. A daughter named Dajon was born of the marriage. On September 13, 2004, while the two were separated, Mr. Dickens fatally shot his wife. As a result of the killing, Mr. Dickens was indicted for first-degree murder, second-degree murder (both specific intent and depraved heart), involuntary manslaughter, use of handgun in the commission of a felony, and wearing or carrying a handgun.

In April 2005, Mr. Dickens was tried by a jury in the Circuit Court for St. Mary's County and found guilty of all charges. The court imposed a sentence of life imprisonment for the first-degree murder conviction and a consecutive twenty-year prison sentence for use of a handgun in the commission of a felony.

In this appeal, Mr. Dickens raises two questions:

1. Did the trial court err in admitting State's Exhibits 26 through 34 into evidence?

2. Did the trial court err in accepting inconsistent verdicts?

## I.

The only issue that separated the prosecutor and the defense at trial was whether the killing of Darlene Dowsey was premeditated murder or a lesser degree of culpable homicide.

The victim's sister, Deidre Carroll, and the victim were at their mother's house on the evening of September 13, 2004, preparing to leave on a trip. At approximately 9:00 p.m. that evening, Ms. Carroll was outside packing the car while the victim, Ms. Dowsey, was inside her mother's house. Mr. Dickens approached the house with a gun in his right hand. Ms. Carroll shouted for her sister to close the front door, but Mr. Dickens went inside before he could be barred from entry. Ms. Carroll called 911 on her cell phone and then heard her sister crying and screaming. With the 911 operator still on the line, Ms. Carroll approached the front door, opened it, and entered. She retreated, however, when she saw Mr. Dickens approach her. He then shut the door in her face.

When the police arrived, they found Ms. Dowsey face down on the floor in the front hallway of her mother's home. She was dead due to a gunshot wound to the head.

Evidence produced by the State showed that immediately after the shooting, Mr. Dickens went to a nearby house, knocked on the front door, and told the neighbors that he had "done something to his girlfriend" and that "they would be looking for him." The neighbor called the police, who arrested Mr. Dickens that evening. A cell phone was found the next day near the neighbor's house. That cell phone was later introduced at trial as State's Exhibit 21.

After his arrest, Mr. Dickens gave a statement to Officer David Alexander of the Criminal Investigation Division of the St. Mary's County Sheriff's Department. In his statement, Mr. Dickens admitted shooting his wife after going to her mother's house armed with a handgun. According to his statement, he had planned to commit suicide in front of Ms. Dowsey, but after he told his wife of his plan to kill himself, she told him to "go ahead." In Mr. Dickens' words, he then "lost it" and fatally shot Ms. Dowsey. He advised the investi-

gating police officers of the location of the handgun used in the shooting. In addition, he also told the police that most of his problems with his wife started in May of 2004.

The State's theory of the case was that Mr. Dickens had been contemplating the murder of his wife for several months prior to the date of the shooting. Colette Thomas, who worked with the victim at a JCPenney store, testified that approximately two months before the shooting she was taking a walk with a woman whose first name was Tamika, when Mr. Dickens pulled up next to them in his pick-up truck. Referring to the victim, Mr. Dickens told Tamika that he was going to "find out who the guy is she's messing with in Capitol Heights" and "deal with them." Dickens then added, "I got something for both of them."

Sherron Bush, in August of 2004, was engaged in a sexual relationship with the victim. He testified that he and the victim went to a motel in St. Mary's County at approximately 2:00 or 3:00 a.m. on the morning of August 29, 2004. Immediately after Mr. Bush and the victim entered the motel room, Mr. Dickens tried to force his way inside the room. At 4:34 a.m. on the 29th of August 2004, Ms. Dowsey received a text message that read: "She better enjoy her last day in the motel[.] Get ready for the shocker." After receipt of this message, the victim showed it to Mr. Bush.

Four days before the motel-room incident, on August 25, 2004, at 8:59 p.m., Ms. Dowsey received the following text message concerning Dajon, the minor daughter of appellant and the victim: "You wanna stop me from seeing Dajon[.] Your [sic] keep taking me as a fucking joke[.] Im [sic] trying my best to keep it together."

In early July 2004, the cell phone the victim was using received three text messages. All three were from someone who called himself "Doll/M." The first of the messages from "Doll/M" was sent at 10:56 a.m. on July 6, 2004. The text message was, "Im [sic] gonna shock the whole county tonight[.]" On the morning of July 7, 2004, Doll/M sent two messages. The first was at 9:50 a.m. and read, "Until death

do us part bitch[.]" The second July 7, 2004, text message, sent 23 minutes after the first, said, "Bad weather on the way[.] I'll be there in 15m and Im [sic] getting Dajon[.]"

Two nights before appellant's wife was fatally shot, on September 11, 2004, Mr. Dickens and his wife had a confrontation at the Happyland Club in St. Mary's County. James Curtis, a friend of the victim's, testified that Mr. Dickens and the victim were arguing at the club and that Mr. Dickens, while "outraged," pushed his wife in the head with two of his fingers. Anthony Shelton, a security guard at the club, heard Dickens say to his wife as he was being restrained: "Bitch, you're going to regret this."

Celeste Courtney testified that she saw Mr. Dickens at the Happyland Club on September 11 with a gun. Mr. Dickens remarked in her presence that he had "something to do, business to take care of." Ms. Courtney told Dickens to give her the gun "so he wouldn't get in trouble." Mr. Dickens surrendered the gun that night to Ms. Courtney but retrieved it from her on the morning of September 12, 2004, one day before Ms. Dowsey was shot.

## II.

Appellant argues that the five text messages mentioned above were inadmissible because, purportedly, they were not properly authenticated by the State.

The victim's mother, Alma Jean Young, testified that a few months before her daughter was killed she gave the victim a cell phone so that she could call 911 in the event she had a problem with appellant. That phone was introduced into evidence as State's Exhibit 25. A few days after her daughter's murder, Ms. Young took possession of that cell phone and scrolled for text messages. She read the five text messages (quoted above) and then contacted Detective Alexander, who took photographs of each of the messages. Those photographs were introduced into evidence as State's Exhibits 26–34.

The text message sent on August 29, 2004, showed the number of the sender to be 240–431–1306. Ms. Young testified that this was the number for a cell phone that initially belonged to the victim but had been given to appellant by the victim. According to Ms. Young, appellant had the use of that cell phone in the July—August 2004 time period. Ms. Young's testimony that Mr. Dickens had possession of the cell phone (introduced into evidence as State's Exhibit 21) was corroborated by the fact that, on the day after the killing, the cell phone was found near the home of the neighbor to whom appellant had reported, shortly after the shooting, that "he had done something to his girlfriend."

At trial, appellant's counsel objected to any of the text messages being admitted into evidence because none had been linked to appellant.

Maryland Rule 5–901(b) sets forth several ways in which documents can be authenticated. Subparagraphs (1) and (4) describe two frequently used paths to authentication:

(1) **Testimony of witness with knowledge.** Testimony of a witness with knowledge that the offered evidence is what it is claimed to be. . . .

\* \* \*

(4) **Circumstantial Evidence.** Circumstantial evidence such as appearance, contents, substance, internal patterns, location, or other distinctive characteristics, that the offered evidence is what it is claimed to be. . . .

\* \* \*

State's Exhibits 33 and 34 were photocopies of the text message sent at 4:34 a.m. on August 29. This message was linked to appellant by both direct and circumstantial evidence.

The text message sent on August 29, 2004, read: "She better enjoy her last day in the motel[.] Get ready for the shocker." The State proved that appellant followed the victim and her male friend to a motel and tried to enter their motel room only one to two hours before the August 29 message was sent. Taking into consideration what appellant did later (shot

his wife) and given the fact that there could only have been an exceedingly small number of persons who possibly could have known that the victim was staying at a motel with a boyfriend at the time the message was sent, when coupled with evidence of appellant's prior threats directed at his wife, a jury could infer, legitimately, that appellant sent the message. *See Massimo v. State,* 144 S.W.3d 210, 216 (Tex.App.2004) (recognizing that documents may be authenticated where contents include details about which only defendant would know or where contents discussed activities of defendant). In any event, inferences aside, the phone number on the text message directly showed that it was sent from a phone (State's Exhibit 21) that appellant possessed up until he discarded it shortly after he killed the victim. Thus, the text message dated August 29, 2004, was properly authenticated.

■ The text message sent on August 25, 2004, at 8:25 a.m. had *no* return phone number. But circumstantial evidence, as permitted by Maryland Rule 5–901(b)(4), provided adequate proof that the message was sent by appellant. Other than the victim, who had custody of Dajon, only appellant had a right to "see" Dajon. With that in mind, what was said is important, viz.: "You wanna stop me from seeing Dajon[.] Your [sic] keep taking me as a fucking joke[.] Im [sic] trying my best to keep it together." From the above information, the jury could infer, legitimately, that the message sent on August 25, 2004, was sent by the victim's estranged husband. See *United States v. Safavian,* 435 F.Supp.2d 36, 38 (D.D.C.2006), where the Court recognized that, under Federal Rule 901, from which Maryland Rule 5–901 is derived, the burden of proof for authentication is slight, and the court "need not find that the evidence is necessarily what the proponent claims, but only that there is sufficient evidence that the *jury* ultimately might do so."

■ As mentioned earlier, the text messages sent on July 6–7, 2004, both were sent by a person calling himself or herself "Doll/M." The "Doll/M" nickname was an obvious reference to the famous movie (1954) and television remake

(1981) "Dial M for Murder." Because there was strong evidence that the victim was in fact murdered by her husband and because the sender of the message made a reference to wedding vows ("until death do us part"), circumstantial evidence existed that the July 7, 2004, message was sent by the victim's estranged husband, John Dickens. And, because "Doll/M" was also the nickname of the person who sent the July 6, 2004, message, the State adequately proved, by circumstantial evidence, that the same person sent the July 6 and 7 messages.

The inference that appellant and "Doll/M" were one and the same was further bolstered by appellant's actions during that period when the "Doll/M" text messages were sent, i.e., telling Colette Thomas' friend that he was going to find who the victim "was messing with" in Capitol Heights and "deal with them."

Under all these circumstances, the trial judge did not err in ruling that the text messages were properly authenticated.

Appellant argues:

> In this case, defense counsel questioned the authenticity of the text messages, arguing that they had not been linked to Mr. Dickens. He argued, as well, that their content was irrelevant, and that some of them had occurred long before the shooting. The court's ruling, however, made no mention of the issue of authentication, but, instead, commented only on relevance.

(Reference to appendix omitted.)

■ Appellant further maintains that because the trial judge did not say that he found the text messages had been authenticated, the judge did not exercise his discretion when he allowed the messages into evidence. We reject both contentions.

■ The trial judge was well aware of the authentication issue. During the direct examination of Alma Young, defense counsel objected to Ms. Young's testifying regarding the content of one of the text messages, to which the prosecutor

responded: "I'm trying to lay the groundwork to establish that she knows these are from Mr. Dickens, Your Honor." The court replied: "I think counsel is entitled to lay a foundation." Thereafter, during the argument concerning the admission into evidence of the text messages, both the prosecutor and defense counsel vigorously argued about whether the text messages had been authenticated. The fact that the court did not specifically refer to authentication in ruling that the messages were admissible is in no way controlling. In reviewing a decision on the admissibility of evidence, it must be presumed that the trial judge knew the law, and applied it properly. *See Gilliam v. State,* 331 Md. 651, 673, 629 A.2d 685 (1993). That presumption was not rebutted in this case. Moreover, in reaching a decision as to admissibility of evidence or any other subject, a trial judge is not required "to spell out in words every thought and step of logic" taken to reach a conclusion. *Beales v. State,* 329 Md. 263, 273, 619 A.2d 105 (1993).

■ Appellant also argues that the text messages were "not relevant to establish" premeditation and deliberation, which was the purpose for which the trial court admitted them. The text messages from appellant were relevant to show that over a course of about two-and-one-half months prior to the fatal shooting, appellant made at least four veiled threats to kill his wife. This evidence was important to help the State meet its burden of convincing the jury that appellant's decision to kill his wife was not one made on the "spur of the moment," as appellant claimed when he gave his statement to the police.

## III.

■ Appellant argues:

The trial court erred in accepting inconsistent verdicts, where the jury convicted Mr. Dickens of first- and second-degree specific-intent murder and depraved-heart murder and involuntary manslaughter.

The jury was instructed orally by the trial judge, and in addition, a written copy of the judge's instructions was given to the jury. The judge's instructions said, in part:

If the State proved, beyond a reasonable doubt that the defendant killed Darlene Michelle Dowsey, and did so with the necessary specific intent, even though intoxicated, then you should find the defendant guilty of the appropriate variety of specific-intent murder. *If you find the defendant guilty of specific-intent murder, do not address depraved-heart murder or involuntary manslaughter.* If, on the other hand, in light of the defendant's intoxication, the State did not prove, beyond a reasonable doubt, that the defendant killed Darlene Michelle Dowsey with the necessary specific intent, then you should consider depraved-heart murder. . . .

If the State proved, beyond a reasonable doubt, the defendant committed second-degree depraved-heart murder, *do not consider involuntary manslaughter.* If on the other hand, the State did not prove, beyond a reasonable doubt, that the defendant committed second-degree depraved-heart murder, then you should consider involuntary manslaughter.

(Emphasis added.)

During deliberations, the jury sent a note to the trial judge that read: "Judge Raley, do we mark guilty/not guilty on involuntary manslaughter if we have voted on all the other counts?" The court answered that question in the affirmative.

About twenty minutes later, the jury sent out a second note, which read:

Judge Raley, if we find the [d]efendant guilty of second-degree depraved-heart murder, how do we mark the involuntary manslaughter charge, as . . . Paragraph 7 [of the written instruction] says do not consider? We are not sure how it should be marked. Sorry for seeming a little dense about this.

With the consent of both the prosecutor and defense counsel, the trial judge gave a written response to the jury note that read:

> Please mark verdict sheet "guilty" or "not guilty" of involuntary manslaughter.

Twenty minutes after receiving the aforementioned answer, the jury returned to the courtroom and rendered its verdict, finding the defendant guilty of every charge on the verdict sheet.

In this appeal, appellant contends that depraved-heart murder and involuntary manslaughter convictions are both inconsistent with convictions of specific-intent, first- and second-degree murder. This is true, argues appellant, because

> [o]ne cannot unintentionally cause a death by gross negligence or under circumstances manifesting a depraved heart while harboring an intent to kill or cause serious bodily harm. The mens rea for involuntary manslaughter and depraved-heart murder are inconsistent with those required for first-degree premeditated murder and second-degree specific-intent murder. For this reason, involuntary manslaughter and depraved-heart murder are not lesser-included offenses of first-degree ... premeditated murder, and do not merge with it; rather, second-degree specific-intent murder and involuntary manslaughter are the lesser-included offenses.

The State counters that this issue was not preserved for appellate review.

The appellant, although he does not directly address the preservation issue, mentions in his argument the opinion of the Court of Appeals in *State v. Hawkins,* 326 Md. 270, 604 A.2d 489 (1992), which, among other things, deals with the issue of whether a defendant was prejudiced by inconsistent verdicts. In *Hawkins,* the Court held that the defendant "suffered prejudice by reason of her conviction of the count of accessory after the fact[, which was inconsistent with the conviction for first-degree murder, because] the guilty verdict subjected her to punishment." *Id.* at 290, 604 A.2d 489.

In the trial court, defense counsel never objected to any instruction given to the jury and interposed no objection when the jury returned the verdicts, which appellant now says were inconsistent. More important, no sentence was imposed for either the depraved-heart second-degree murder or the involuntary-manslaughter conviction. Appellant was, therefore, not prejudiced.

The governing law in this regard was set forth in *Jenkins v. State*, 59 Md.App. 612, 621–22, 477 A.2d 791 (1984); *rev'd in part on other grounds*, 307 Md. 501, 515 A.2d 465 (1986):

There have been a number of cases in which defendant[s]/appellants have attempted to complain about inconsistent verdicts on appeal, without having raised the issue below. The "bottom line" of these decisions seems to be that, unless some real prejudice is shown, no relief will be granted. Implicit from that is that, if such prejudice *is* demonstrated, relief may be granted.

In *Bell v. State*, 220 Md. 75 [150 A.2d 908] (1959), inconsistent convictions for larceny and receiving stolen goods were handed down by a trial judge sitting without a jury. The Court of Appeals found that, by reason of the inconsistency, the verdicts were defective, but it affirmed the decision of the lower court on two grounds. It held first that "since the question was not raised below in any manner, it may be that the defendant waived the inconsistency." *Bell*, 220 Md. at 81 [150 A.2d 908]. The Court also concluded that since only one sentence was imposed which was within the penalty prescribed for either of the offenses, "it does not appear that the defendant has been prejudiced by the rendition of inconsistent verdicts [and] we see no reason to make such inconsistency the basis for a remand of the case for further proceedings or a new trial." 220 Md. at 81 [150 A.2d 908]. In a footnote, the Court explicitly recognized that if the trial court "had passed sentence on both of the inconsistent counts, a different question would be raised." 220 Md. at 81 n. 2 [150 A.2d 908].

In *Hardesty v. State,* 223 Md. 559 [165 A.2d 761] (1960), the trial court, sitting without a jury, handed down inconsistent verdicts, finding Hardesty guilty of both larceny and receiving stolen goods. Only one sentence was imposed, which was within the range permitted for both offenses. The Court of Appeals affirmed the judgments, relying on both waiver and lack of prejudice. *See also Boone v. State,* 2 Md.App. 80 [233 A.2d 476] (1967), but *compare Tender v. State,* 2 Md.App. 692 [237 A.2d 65] (1968), *cert. denied,* 250 Md. 733, *cert. denied,* 393 U.S. 1096, 89 S.Ct. 885, 21 L.Ed.2d 787 (1969); and *Price v. State,* 3 Md.App. 155 [238 A.2d 275], *cert. denied,* 250 Md. 733 (1968).

This case presents that very circumstance noted in the footnote in *Bell, supra,* 220 Md. at 81 [150 A.2d 908]. The court not only imposed separate sentences on both convictions, but the twenty-five year sentence meted out for assault with intent to murder far exceeded the ten-year maximum allowed for assault with intent to maim, disfigure, or disable. Clearly, there was prejudice here, and it is of sufficient magnitude to require that we exercise our discretion under Rules 757 and 1085 and take cognizance of the error.

In the case at hand, there was no prejudice, because appellant was not subjected to multiple punishments based on the inconsistent verdict.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**