9 A.3d 99

**Everette Alexander CARPENTER**

v.

**STATE of Maryland.**

**No. 2927, Sept. Term, 2008.**

Court of Special Appeals of Maryland.

Dec. 1, 2010.

Amy E. Brennan (Paul B. DeWolfe, Public Defender, on the brief) Baltimore, MD, for appellant.

Edward J. Kelley (Douglas F. Gansler, Atty. Gen., on the brief) Baltimore, MD, for appellee.

Panel: KRAUSER, C.J., WOODWARD, RAYMOND G. THIEME, JR. (Retired, Specially Assigned), JJ.

RAYMOND G. THIEME, JR., J. (Retired, Specially Assigned).

Convicted, after a jury trial in the Circuit Court for Talbot County, of attempted first degree murder, first degree assault, robbery, and handgun offenses, appellant, Everette Alexander

Carpenter, presents four questions for our review, which we rephrase for clarity: [1]

 I. Did the court err or abuse its discretion in admitting testimony regarding information stored in a cell phone?

 II. Did the court err in failing to merge Carpenter's conviction for first degree assault into his conviction for attempted first degree murder?

 III. Did the court err in failing to merge Carpenter's conviction for wearing, carrying, and transporting a handgun into his conviction for use of a handgun in the commission of a crime of violence or felony?

 IV. Did the court err in ordering that Carpenter serve his sentence for use of a handgun in the commission of a crime of violence or felony consecutive to his sentence for attempted first degree murder?

For the reasons that follow, we shall vacate Carpenter's sentence for wearing, carrying, and transporting a handgun, and otherwise affirm the judgments of the circuit court.

## Facts

On the morning of December 3, 2007, Fenton Forestal was walking down Blake Street in Easton, when he was approached by Carpenter, Tyrell Skinner, and Tynesha Cornish. Forestal spoke with Skinner, who was a football teammate of Forestal's brother. During the conversation, Forestal decided to show the group a picture of his grandmother that he kept in

---

**1.** Carpenter's questions presented *verbatim* are:

 1. Did the trial court err or abuse its discretion in admitting information obtained from a cell phone where the State failed to establish the authenticity, reliability and accuracy of the information?

 2. Did the trial court err by failing to merge the sentence for first degree assault into the sentence for attempted first degree murder?

 3. Did the trial court err by failing to merge the sentence for wearing and carrying a handgun into the sentence for use of a handgun in a felony or crime of violence?

 4. Did the trial court err in imposing five years for use of a handgun in a felony or crime of violence consecutive to attempted murder, where the record shows that the court believed that the five year sentence had to be imposed consecutively?

his wallet with his money and "green card." [2] When Forestal produced his wallet, however, Carpenter grabbed the wallet and walked away. Forestal noticed that Carpenter had dropped a cell phone and picked the cell phone up.

Thinking that Carpenter was "playing around," Forestal followed Carpenter and asked Skinner to tell Carpenter to return the wallet. Carpenter and Skinner then "jumped at" Forestal, repeatedly punching him in his eyes. Pushing the men away, Forestal ran.

About twenty minutes later, Forestal noticed that someone was calling the cell phone that Carpenter had dropped. Afraid to answer the cell phone, Forestal received numerous additional calls. When Forestal finally answered a call, the caller offered to exchange Forestal's wallet for the cell phone. When Forestal refused, the caller threatened to kill Forestal's family. Afraid for his family's safety, Forestal agreed to meet the caller at a gas station at the intersection of Locust Lane and Dover Street.

At the gas station, Forestal saw Carpenter and returned the cell phone to him. Waiting to receive his wallet, Forestal saw Carpenter draw a gun from his waist. As Forestal turned and ran, he was shot in his back and left arm. Forestal then ran to a friend's house.

Hearing gunshots "from the direction of Dover Street" and "someone running and yelling for help," Christopher Rainer, who lived on Locust Lane near its intersection with Dover Street, called 911. Approximately three minutes later, Patrolmen George Larrimore, Jr. and Rob Schuerholz of the Easton Police Department responded to Rainer's call and saw Carpenter walking "[l]ess than a block" from Dover Street. Patrolman Larrimore stopped Carpenter and asked him "how long he had been in the area outside[.]" Carpenter replied: "[A]pproximately ten minutes." After conducting a "pat down" of Carpenter, the patrolman allowed him to leave.

---

**2.** Forestal is from Haiti.

Several minutes later, police received a "911 call indicating that there was a male in some sort of distress in front of ... 318 Goldsborough Street," approximately two blocks from Rainer's home and three blocks from where Patrolman Larrimore stopped Carpenter. Responding to the address, Patrolman Schuerholz discovered Forestal "lying on the ground and ... yelling that he had been shot." After the patrolman contacted paramedics, Forestal was transported to Easton Memorial Hospital, where he was diagnosed with gunshot wounds to his left upper arm and lower back and a fractured left eye socket. During a subsequent meeting at the hospital with Detective Milton Orellano of the Easton Police Department, Forestal identified Carpenter in a photo array as the person who shot him.

Two days later, police located a handgun outside the home of Kevron Chase, who lived approximately 125 yards from the gas station at Locust Lane and Dover Street. During a subsequent interview with Detective Orellano, Chase stated that the gun belonged to Carpenter. Chase further stated:

[At] approximately one or two in the morning [Carpenter] came knocking to [Chase's] window and asked to use his phone to call Mr. Forestal. [Carpenter] asked Mr. Forestal if he could get his phone and Mr. Forestal told [Carpenter] no. Mr. Forestal asked [Carpenter] for his wallet and [Carpenter] tells him that not until he gets his phone back. [Carpenter] then tells him that he has his green card and he will burn it if he doesn't get his phone. Mr. Forestal then asks where could he meet him and he said at Super Soda. [Carpenter] then leaves to Super Soda about ten minutes later. [Carpenter] came running to his house and knocked on the window. [Carpenter] then told him that he unloaded the whole gun on Mr. Forestal and he wasn't sure if he hit him. Mr. Chase then told him to leave. Later [Carpenter] called him and told him that the police had stopped him. [W]hen the police ... raided the residence [Carpenter] had called him and told him to look for the gun which was near a tree to the right as you walk out the back door.

Later, Detective Orellano interviewed Skinner, who stated that "Carpenter snatched the wallet and . . . dropped his cell phone." After Carpenter called Forestal, Skinner stated, Forestal "came back and [Carpenter] beat him up again."

At trial, Forestal, testifying for the State, identified Carpenter as the person who took his wallet and assaulted and shot him.

We shall include additional facts in our discussion of the issues.

## Discussion

### I.

Also at trial, the State called Caroline George, who testified that she had known Carpenter for "approximately a year and a half," and that during that time, she "obtain[ed] phone numbers from [Carpenter] for business purposes[.]" Prior to December 3, 2007, George stated, Carpenter told George that his cell phone number was 443–205–3233, and his home phone number was 410–770–3929.

Later, the State called Detective Orellano, who testified that he seized a cell phone from Carpenter during Carpenter's arrest. After "obtain[ing] a search warrant for the contents of the [cell] phone," the detective testified, he "checked the [cell phone's] pictures content, text message content, calls, into and include [sic] received, missed, [and] dialed[.]" If a "number was in the [cell phone's] data base," Detective Orellano stated, "it show[ed] up as a name rather than a telephone number[.]"

When the prosecutor asked Detective Orellano to list the calls received by the cell phone, including "what the telephone numbers were and what time they were," defense counsel objected. After a discussion at the bench, the court overruled defense counsel's objection, and the following colloquy occurred:

[PROSECUTOR: F]rom the first call after 1 a.m. could you give us the on [sic] December 3rd, 2007 the time and either the number or the name that appeared with the received call to this cell phone.

[DETECTIVE ORELLANO:] Okay, at 1:08 a.m. a called [sic] received was from Skinner. 1:52 a.m. a call was 410–770–3929. 2:21 a.m. was from 410–725–0444. At 2:27 a.m. was ...

\* \* \*

... 410–725–0444. At 2:30 a.m. was from Skinner. At 2:36 a.m. was from 410–770–3929.

[PROSECUTOR:] Now with regard to the 410–725–0444 number do you know whose telephone number that is?

\* \* \*

[DETECTIVE ORELLANO:] Kevron Chase.

[PROSECUTOR:] And ... what was the actual number of the cell phone, did you get that?

\* \* \*

[DETECTIVE ORELLANO:] 443–205–3233.

[PROSECUTOR:] Now were there also missed calls between 1 a.m. and ... 2:40 a.m.[?]

[DETECTIVE ORELLANO:] Okay, missed calls December 3rd, 2007, at 1:01 a.m. phone number was 443–497–4452. At 1:03 a.m. same number. At 1:05 a.m. Skinner. Same thing at 1:05 a.m. Skinner. 1:06 a.m. 410–820–7559. 1:07 a.m. with Skinner. 1:09 a.m. Skinner. 1:09 a.m. was 410–820–7559. 1:15 a.m. it said restricted. 1:17 was 443–497–4452. 1:23 a.m. restricted. 1:24 a.m. Skinner. 1:34 a.m. Skinner. And that was it.

Later, in closing argument, the prosecutor stated:

Detective Orellano goes through the calls and you see from the calls the timing of when the calls are being ignored, when the calls are being received and that the calls are either coming from Skinner's cell phone or Kevron Chase's phone or Mr. Carpenter's home phone according to Ms. George's recollection of the numbers. There's a couple of other calls in there from an unknown number.

But most of these calls are coming in from places that Mr. Carpenter could get to, his house, Mr. Chase, and ... that's the two main ones. His house and Mr. Chase and Mr.

Skinner's phone. .... [W]ho else's cell phone was it going to be? And how is if it's Mr. Skinner's cell phone that needs to be recovered, then how is Mr. Skinner calling it?

In rebuttal, the prosecutor stated:

Why and how Mr. Forestal's receiving the phone calls why are they coming from Mr. Chase's phone to Mr. Forestal? Because as Mr. Chase told the police [Carpenter] came and asked to use my phone and I let him and he called Mr. Forestal and this is the conversation I overheard. Now if it was Mr. Chase's cell phone that needed to be recovered and Mr. Forestal would have had it and they would had [sic] to be calls, there wouldn't have been a call from Mr. Chase's phone to anywhere at that time in the morning because Mr. Forestal was not calling out, he was receiving the calls. The same thing with Mr. Skinner. The same thing with the home phone.

Carpenter contends that the court "erred and abused its discretion" in admitting Detective Orellano's testimony for two reasons. First, the testimony violated "the rules against the admission of hearsay[.]" *See* Rule 5–802 ("Except as otherwise provided by these rules or permitted by applicable constitutional provisions or statutes, hearsay is not admissible."). Second, "the court had no basis upon which to conclude that the information [stored in the cell phone] was authentic, reliable[,] and accurate." *See* Rule 5–901(a) ("The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.").

██ With respect to whether Detective Orellano's testimony violated "the rules against the admission of hearsay," Rule 5–801(c) defines "hearsay" as "a statement, other than one made by the declarant while testifying at [a] trial or hearing, offered in evidence to prove the truth of the matter asserted." Rule 5–801(a) defines "statement" as "(1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion." Rule 5–801, however, "does

not attempt to define 'assertion[.]'" Rule 5–801 committee note.

*Fields v. State,* 168 Md.App. 22, 895 A.2d 339, *aff'd,* 395 Md. 758, 912 A.2d 637 (2006), is instructive. Fields's

> convictions stem[med] from the shootings of three young men at a bowling alley in Clinton, Maryland, shortly after midnight on May 17, 2003. The three men were among a group of about [fifteen] employees of a nearby supermarket who were enjoying a night out at the bowling alley. Tyneal Bussey was killed by a gunshot wound to the chest. Early Eborn was shot in the abdomen and Rozier Davis was shot in the arm.

* * *

> The State's evidence showed that, while at the bowling alley on the night in question, [Fields] became involved in a dispute with Bussey and asked Bussey to step outside. [Fields] exited the bowling alley and went outside to the parking lot as Bussey ... headed for the doorway .....
>
> A crowd gathered by the doorway of the bowling alley. Several witnesses testified that a white car was parked outside, and that [Fields] was standing beside the car, holding a rifle. When Bussey reached the doorway, [Fields] opened fire, killing Bussey and injuring Davis and Eborn.....

* * *

> There was also evidence introduced by the State that [Fields, whose first name is Saturio,] went by the nickname "Sat Dogg."

* * *

> Detective Ismael Canales, a member of the homicide unit of the Prince George's County Police Department, was among the officers who responded to a report of shootings at the bowling alley. Once inside, he observed that there was a television monitor at each bowling lane, and the names and scores of the bowlers at that lane were displayed on the screen.

. . . . . . . Detective Canales proceeded to make a handwritten list, itemizing each bowling lane and the names displayed on the screen for that lane.

. . . . Detective Canales recorded the names on the screen above lane 22 as "Sat Dogg/Bleu/Vino."

\* \* \*

On direct examination of Detective Canales, defense counsel objected when the prosecutor asked foundational questions about the detective's handwritten list . . . . . . . .

The trial court overruled the objection and allowed questioning to proceed. Over further objections, Detective Canales testified that he saw the names that were displayed on the television screens at the bowling lanes and wrote [a list] to document the names he saw[.]

\* \* \*

In closing argument, the prosecutor made two references to the evidence that "Sat Dogg's" name was displayed on one of the television screens. First, in recounting Detective Canales's testimony about what he did upon arriving at the bowling alley the night of the shootings, the prosecutor said:

And Detective Canales, the lead investigator, that was his job to find out who did it, put it together. When he came there, there is no evidence introduced at all that he knew anything, who Saturio Fields was, who Sat Dogg was. No evidence at all. But what did he do? . . . .

. . . . He wrote down the names from all the screens. And when he did that, he just did it out of instinct, but he did it . . . . .

Second, the prosecutor included the name-on-the-screen evidence in his review of items found at the crime scene that tended to show that [Fields] was there . . . . . The prosecutor then added:

What about the name on the television monitor? Connection to the crime scene. . . . . Where was the name Sat Dogg? Lane 22.

*Id.* at 27–31, 895 A.2d 339. Fields was subsequently convicted of first degree murder and two counts of first degree assault. *Id.* at 28, 895 A.2d 339.

On appeal, Fields contended that the court erred in admitting the "name-on-the-screen evidence" because "the evidence was hearsay[.]" *Id.* at 26, 31, 895 A.2d 339. Concluding that the evidence fell "into the category of non-assertive circumstantial crime scene evidence" rather than "an implied assertion that [Fields] was present in the bowling alley that night," *id.* at 36–37, 895 A.2d 339, we stated:

> The prosecutor did not attempt to use the evidence of the words "Sat Dogg" on the screen at the bowling alley to show that a known declarant believed [Fields] was present there, had reason to accurately hold that belief, and therefore was impliedly asserting that factual proposition by entering his nickname on the screen. [T]he probative value of the evidence that [Fields's] name was on the television screen did not depend upon the belief of the person who typed the name on the screen, or upon the accuracy of that person's belief. The prosecutor did not argue that the person who entered the name "Sat Dogg" on the screen only would have done so if he or she believed that [Fields] was present in the bowling alley. Indeed, there was no evidence about that person's belief, because the person was not identified. The prosecutor argued only that the crime scene included a bowling lane with the name "Sat Dogg" written above it.

> \* \* \*

> [Fields's] name on the television screen in the bowling alley was not an implied assertion of the factual proposition that [Fields] was present at the bowling alley[.] Because the evidence was not an "assertion," under Rule 5–801(a), it was not a "statement" under that subsection and hence was not hearsay under Rule 5–801(c). It was admissible non-hearsay evidence. Accordingly, the trial court's evidentiary ruling was not in error.

*Fields,* 168 Md.App. at 37–38, 895 A.2d 339.

We reach a similar conclusion here. The prosecutor did not attempt to use Detective Orellano's testimony to show that a

known declarant believed that Carpenter made the calls to the cell phone, had reason to accurately hold that belief, or was impliedly asserting that factual proposition. The probative value of the evidence that Carpenter's home phone number, Skinner's name, and Chase's phone number were stored in Carpenter's cell phone did not depend upon the belief of the person who called, or upon the accuracy of that person's belief. In fact, like in *Fields*, "there was no evidence about that person's belief, because the person was not identified." *Id.* at 37, 895 A.2d 339. Because the prosecutor argued only that the cell phone belonged to Carpenter and that calls were made to the cell phone from phones belonging to Carpenter, Skinner, and Chase, the calls missed and received by the cell phone were not assertions, statements as defined by Rule 5–801(a), or hearsay as defined by Rule 5–801(c). Hence, the court did not err in admitting Detective Orellano's testimony regarding the calls.

We now turn to Carpenter's contention that "the court had no basis upon which to conclude that the information [stored in the cell phone] was authentic, reliable[,] and accurate." We reviewed a similar contention in *Dickens v. State*, 175 Md.App. 231, 927 A.2d 32 (2007). Dickens was charged with the first degree murder of his wife, Darlene Dowsey. *Id.* at 234, 927 A.2d 32. At trial,

> [t]he only issue that separated the prosecutor and the defense ... was whether the killing of ... Dowsey was premeditated murder or a lesser degree of culpable homicide.

> \* \* \*

Sherron Bush, in August of 2004, was engaged in a sexual relationship with the victim. He testified that he and the victim went to a motel in St. Mary's County at approximately 2:00 or 3:00 a.m. on the morning of August 29, 2004. Immediately after Mr. Bush and the victim entered the motel room, Mr. Dickens tried to force his way inside the room. At 4:34 a.m. on the 29th of August 2004, Ms. Dowsey received a text message that read: "She better enjoy her

last day in the motel[.] Get ready for the shocker." After receipt of this message, the victim showed it to Mr. Bush.

\* \* \*

The victim's mother, Alma Jean Young, testified that a few months before her daughter was killed she gave the victim a cell phone so that she could call 911 in the event she had a problem with [Dickens]. . . . . A few days after her daughter's murder, Ms. Young took possession of that cell phone and scrolled for text messages. She read the . . . text message[ ] (quoted above) and then contacted [police.] . . . .

The text message sent on August 29, 2004, showed the number of the sender to be 240–431–1306. Ms. Young testified that this was the number for a cell phone that initially belonged to the victim but had been given to [Dickens] by the victim. According to Ms. Young, [Dickens] had the use of that cell phone in the July—August 2004 time period. Ms. Young's testimony that Mr. Dickens had possession of the cell phone . . . was corroborated by the fact that, on the day after the killing, the cell phone was found near the home of [a] neighbor to whom [Dickens] had reported, shortly after the shooting, that "he had done something to his girlfriend."

*Id.* at 235–38, 927 A.2d 32. Dickens was subsequently convicted of first degree murder and related charges. *Id.* at 234, 927 A.2d 32.

On appeal, Dickens contended that the text message was "inadmissible because, purportedly, [the text message was] not properly authenticated by the State." *Id.* at 237, 927 A.2d 32. Affirming Dickens's convictions, we stated:

Maryland Rule 5–901(b) sets forth several ways in which documents can be authenticated. Subparagraphs (1) and (4) describe two frequently used paths to authentication:

(1) **Testimony of witness with knowledge.** Testimony of a witness with knowledge that the offered evidence is what it is claimed to be. . . .

\* \* \*

**(4) Circumstantial Evidence.** Circumstantial evidence[,] such as appearance, contents, substance, internal patterns, location, or other distinctive characteristics, that the offered evidence is what it is claimed to be....

\*　　\*　　\*

[T]he text message sent at 4:34 a.m. on August 29 ... was linked to [Dickens] by both direct and circumstantial evidence.

.... The State proved that [Dickens] followed the victim and her male friend to a motel and tried to enter their motel room only one to two hours before the August 29 message was sent. Taking into consideration what [Dickens] did later (shot his wife) and given the fact that there could only have been an exceedingly small number of persons who possibly could have known that the victim was staying at a motel with a boyfriend at the time the message was sent, when coupled with evidence of [Dickens's] prior threats directed at his wife, a jury could infer, legitimately, that [Dickens] sent the message. In any event, inferences aside, the phone number on the text message directly showed that it was sent from a phone ... that [Dickens] possessed up until he discarded it shortly after he killed the victim. Thus, the text message dated August 29, 2004, was properly authenticated.

*Dickens,* 175 Md.App. at 238–39, 927 A.2d 32 (citation omitted). *See also State v. Damper,* 223 Ariz. 572, 225 P.3d 1148, 1153 (App.2010) (evidence that the victim and her friend "often communicated with text messages," that the friend "had saved [the victim's] cell-phone number in her own cell phone, denominated by a nickname, and that when [a] text message at issue arrived the morning of the [victim's death], her phone displayed that nickname as the sender of the message," was "sufficient ... to properly authenticate the text message"); *State v. Thompson,* 2010 ND 10, ¶ 26, 777 N.W.2d 617, 626 (N.D.2010) ("evidence from the complainant, including the circumstances of th[e] day [that text messages were sent to the complainant's cell phone] and his knowledge of Thomp-

son's cell phone number and signature on text messages" was "sufficient to authenticate the complainant's testimony" regarding the text messages).

We reach a similar conclusion here. The lists of calls missed and received by the cell phone, as testified to by Detective Orellano, showed that some of the calls were made from phones belonging to Chase, at whose home Carpenter left the handgun, and Skinner, with whom Carpenter assaulted Forestal. Moreover, when Forestal, after answering a call to the cell phone, agreed to meet the caller at a gas station, the person who met Forestal at the gas station was Carpenter. From this evidence, the jury "could infer, legitimately," that Carpenter made the calls missed and received by the cell phone. *Dickens,* 175 Md.App. at 239, 927 A.2d 32. "[I]nferences aside," *id.,* one of the phone numbers in the list of calls received by the cell phone, which Carpenter possessed until he robbed Forestal of his wallet, was Carpenter's home phone number. Moreover, the State presented evidence that Carpenter used Chase's phone to call the cell phone while Forestal possessed the cell phone. This direct and circumstantial evidence "properly authenticated" the calls missed and received by the cell phone. *Id.*

 Carpenter contends that, "[t]o properly admit the information [stored in the cell phone,] the State needed to produce a witness to explain how the information came to be stored in the phone." We reviewed a similar contention in *Griffin v. State,* 192 Md.App. 518, 995 A.2d 791 (2010), *cert. granted,* 415 Md. 607, 4 A.3d 512 (2010). Griffin was charged with the murder of

> Darvell Guest . . . in the women's bathroom of Ferrari's Bar in Perryville, where he was brutally shot seven times. . . . . Griffin's first trial was held in August 2006. At that trial, Dennis Gibbs, [Griffin's] cousin and an eyewitness to Guest's murder, testified that he did not see [Griffin] pursue the victim into the bathroom with a gun. The trial ended in a mistrial.

At [Griffin's] second trial in January 2008, several witnesses testified that they saw [Griffin] with a handgun just before the shooting, and others testified that they witnessed [Griffin] pursue Guest into the women's bathroom, where [Griffin] fired his weapon. Gibbs testified that [Griffin] was the only person, other than Guest, in the bathroom when the shots were fired. According to Gibbs, another cousin, George . . ., was standing "right with me" during the shooting and did not enter the bathroom. He explained the discrepancy in his testimony at the two trials, claiming that Jessica Barber, [Griffin's] girlfriend, had threatened him prior to the first trial.

Thereafter, the court permitted the State to introduce into evidence a redacted printout obtained in December 2006 from a MySpace[3] profile page allegedly belonging to Ms. Barber. The profile page, introduced for the limited purpose of corroborating Gibbs's testimony, said, in part: "JUST REMEMBER, SNITCHES GET STITCHES!! U KNOW WHO YOU ARE!!"

*Griffin*, 192 Md.App. at 523–24, 995 A.2d 791. Griffin was subsequently convicted of second degree murder and related offenses. *Id.* at 522, 995 A.2d 791.

On appeal, Griffin contended that, because "printouts from such social networking sites [such as MySpace] must be authenticated either by the author or expert information technology evidence," the court erred in admitting the MySpace profile printout. *Id.* at 544, 995 A.2d 791. We were "not persuaded" by Griffin's contention, however, because he "never argued below that the printout did not accurately depict the MySpace profile in question." *Id. Accord In re F.P.*, 2005 PA Super 220, ¶ 5, 878 A.2d 91, 93 (Pa.Super.Ct.2005) (rejecting a contention that "it was incumbent upon the Commonwealth [of Pennsylvania] to authenticate [computerized instant messages]

---

**3.** MySpace is an online "social networking site [on which] individuals can create 'profiles' listing their interests in books, television, music, movies, and so forth, as well as posting pictures, music, and videos." *Griffin*, 192 Md.App. at 534, 995 A.2d 791 (internal citation omitted).

by introducing evidence of their source from [an] internet service provider or presenting the testimony of a computer forensics expert").

We are similarly not persuaded by Carpenter's contention. Because Carpenter did not argue below that Detective Orellano's testimony regarding the calls missed and received by the cell phone did not accurately reflect the calls made to the cell phone, the State did not need "to produce a witness to explain how the information came to be stored in the phone," or any other "expert information technology evidence," in order to authenticate the calls. *Griffin*, 192 Md.App. at 544, 995 A.2d 791. The evidence presented by the State was sufficient to authenticate the calls missed and received by the cell phone, and hence, the court did not abuse its discretion in admitting Detective Orellano's testimony. *See id.* at 532–33, 995 A.2d 791 ("[w]hether there is sufficient authenticating evidence to admit a proffered document is a preliminary question to be decided by the court," which "[w]e review ... for abuse of discretion" (citations omitted)).

■ Even if the court erred or abused its discretion in admitting Detective Orellano's testimony, we would conclude that the error or abuse of discretion was harmless. At trial, Forestal, testifying for the State, stated that he was robbed, assaulted, and shot by Carpenter. The State presented evidence that Carpenter discarded a handgun at Chase's home, told Chase that he had shot Forestal, and told police, when he was stopped near the site of the shooting, that he had been "in the area" at the time of the shooting. Moreover, Detective Orellano testified that, during an interview, Skinner stated that he saw Carpenter "snatch" Forestal's wallet and "beat [Forestal] up." The cumulative effect of this evidence so outweighs the allegedly prejudicial nature of Detective Orellano's testimony regarding the cell phone that there is no reasonable possibility that the decision of the jury would have been different had the testimony been excluded. *See Ross v. State,* 276 Md. 664, 674, 350 A.2d 680 (1976) (an error in the admission of evidence is harmless when "the cumulative effect

of the properly admitted evidence so outweighs the prejudicial nature of the evidence erroneously admitted that there is no reasonable possibility that the decision of the finder of fact would have been different had the tainted evidence been excluded").

## II.

 Following trial, the jury convicted Carpenter of attempted first degree murder and first degree assault. At sentencing, the court imposed a sentence of forty years for attempted first degree murder, and a concurrent sentence of 25 years for first degree assault.

Carpenter contends that the court erred in failing to merge the convictions. Because "the robbery and the shooting were so close in time," he claims, "the first degree assault at the time of the robbery ... was a lesser included offense of the attempted first degree murder."

*Hawkins v. State*, 77 Md.App. 338, 550 A.2d 416 (1988), is instructive. A police officer named Hobbs observed Hawkins "pull[ ] out a baggie containing several packets wrapped in aluminum foil and hand[ ] one of the packets to" another individual. *Id.* at 341, 550 A.2d 416. A second police officer, named Ferdock, approached Hawkins, who "started running." *Id.* Hawkins then "reached into his coat pocket[ ] and threw aside the ... baggie." *Id.* "Officer Ferdock retrieved the bag, the substance inside of which later tested positive for marijuana and [PCP]." *Id.* at 341–42, 550 A.2d 416. After Hawkins was convicted of distribution of, and possession with intent to distribute, controlled dangerous substances, the court sentenced him to concurrent twenty-year terms of incarceration. *Id.* at 340, 550 A.2d 416.

On appeal, Hawkins contended that his "possession with intent to distribute count[ ] should [have] merge[d] into the distribution count." *Id.* at 348, 550 A.2d 416. Affirming the court's judgments, we stated:

.... [T]hese two crimes spawned from separate acts[.] Officer Hobbs'[s] surveillance of [Hawkins] gave rise to

[Hawkins's] conviction for distribution of a controlled dangerous substance. .... The distribution was completed. As Officer Ferdock attempted to arrest [Hawkins] a moment later, [Hawkins] discarded a baggie containing a quantity of drugs sufficient to give rise to an inference of an attempt to distribute.

As was stated succinctly by the United States Court of Appeals for the Third Circuit, "[w]hen an individual possesses an amount of [a controlled dangerous substance] that could result in a future distribution, and when the same individual also distributes another quantity of [the controlled dangerous substance], he is punishable for both possession and distribution." *United States v. Carter*, 576 F.2d 1061, 1064 (3rd Cir.1978). Therefore, the trial court did not err in refusing to merge the convictions for possession with intent to distribute a controlled dangerous substance and distribution of a controlled dangerous substance.

*Id.* at 349–50, 550 A.2d 416 (citations and footnote omitted).

We reach a similar conclusion here. Carpenter's punches to Forestal's eyes gave rise to the conviction for first degree assault. Carpenter's subsequent shooting of Forestal gave rise to the conviction for attempted first degree murder. Because these two convictions "spawned from separate acts," *id.* at 349, 550 A.2d 416, the court did not err in failing to merge the convictions.

## III.

■ Following trial, the jury convicted Carpenter of use of a handgun in the commission of a crime of violence or felony, and wearing, carrying, and transporting a handgun. At sentencing, the court imposed a sentence of five years for use of a handgun in the commission of a crime of violence or felony, and a concurrent sentence of three years for wearing, carrying, and transporting a handgun. Carpenter contends, and the State does not dispute, that the court erred in failing to merge his conviction for wearing, carrying, and transporting a handgun into his conviction for use of a handgun in the

commission of a crime of violence or felony. *See Hunt v. State*, 312 Md. 494, 510, 540 A.2d 1125 (1988) (concluding that "the legislature did not intend, under circumstances like those ... before" the Court, "that a separate punishment would be imposed for carrying, wearing, and transporting a handgun consecutive to that imposed for using a handgun during commission of a crime of violence"). We agree, and hence, we vacate Carpenter's sentence for wearing, carrying, and transporting a handgun.

## IV.

■ At sentencing, the State argued:

The first degree attempted murder can carry up to a life sentence. .... And the State's recommendation on that count, Your Honor, is a [forty] year straight time sentence. The use of a handgun in the crime of violence, Your Honor, is required to be a mandatory minimum of five years and carry up to [twenty]. It's also required to be without parole. *And it's required to be consecutive to the crime for which it is attached.* And the State is recommending a five year consecutive sentence on that charge, consecutive to the attempted first degree murder.

(Emphasis added.) The court subsequently imposed upon Carpenter a sentence of forty years for attempted first degree murder, and a sentence of five years for use of a handgun in the commission of a crime of violence or felony, to be served consecutive to the sentence for attempted first degree murder.

Carpenter contends that we "should vacate the consecutive sentence [for use of a handgun in the commission of a crime of violence or felony] and remand the case for a new sentencing on this count," because "the record strongly suggests that the court believed it had no choice but to impose the sentence consecutively[.]" *See Jones v. State*, 414 Md. 686, 693, 997 A.2d 131 (2010) (the "grounds for appellate review of sentences ... recognized in this State" include "whether the sentencing judge was motivated by ... impermissible considerations" (internal citations and quotations omitted)). We

agree that the challenged argument was incorrect. *See* Md. Code (2002, 2007 Supp.), Section 4–204 of the Criminal Law Article ("CL").[4] But, there is no evidence that the court's determination of Carpenter's sentences "was motivated by" the incorrect argument. *Jones,* 414 Md. at 693, 997 A.2d 131. Moreover, the sentence for use of a handgun in the commission of a crime of violence or felony does not offend the Constitution and is within statutory limits. *See Malee v. State,* 147 Md.App. 320, 335, 809 A.2d 1 (2002) (a "court has a power to impose whatever sentence it deems fit as long as it does not offend the [C]onstitution and is within statutory limits as to maximum and minimum penalties," including "the determination of whether a sentence will be consecutive or concurrent" (internal citation and emphasis omitted)). Hence, the court did not err in sentencing Carpenter for use of a handgun in the commission of a crime of violence or felony.

SENTENCE FOR WEARING, CARRYING, AND TRANSPORTING A HANDGUN VACATED. JUDG-MENTS OTHERWISE AFFIRMED. CASE REMANDED TO THE CIRCUIT COURT FOR TALBOT COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.

COSTS TO BE PAID THREE–FOURTHS BY APPEL-LANT AND ONE–FOURTH BY TALBOT COUNTY.

---

4. CL Section 4–204 states:

 (a) *Prohibited.*—A person may not use ... any handgun in the commission of a crime of violence ... or any felony[.]

 (b) *Penalty.*—

 (1)(i) A person who violates this section ... shall be sentenced to imprisonment for not less than 5 years and not exceeding 20 years.

 \* \* \*

 (2) *For each subsequent violation,* the sentence shall be consecutive to and not concurrent with any other sentence imposed for the crime of violence or felony.

 (Emphasis added.)