16 A.3d 211

**Arnell FAIR**

v.

**STATE of Maryland.**

**No. 2741, Sept. Term, 2008.**

Court of Special Appeals of Maryland.

March 30, 2011.

2

William R. Buie, III, Baltimore, MD, for appellant.

Tennant D. Magee, Sr. (Douglas Gansler, Atty. Gen., on the brief), Baltimore, MD, for appellee.

Panel: EYLER, JAMES R., ZARNOCH and JAMES A. KENNEY, III (retired, specially assigned), JJ.

JAMES A. KENNEY, III (retired, specially assigned), J.

Appellant, Arnell Fair, was arrested and charged with possession of a firearm by a convicted felon, carrying or transporting a handgun in a vehicle, and possession of marijuana, a controlled dangerous substance. A jury, sitting in the Circuit Court for Baltimore City, convicted appellant of possession of a firearm by a convicted felon and possession of marijuana. He was sentenced to five years without the possibility of parole for the firearm conviction and to a consecutive one year

for the marijuana possession conviction. He presents the following issues for our review, which we have slightly reworded:

I.   Did the circuit court err by denying appellant's pretrial motion to suppress the key and the remote to the Cadillac automobile, the marijuana, or the firearm found in the Cadillac under the Fourth Amendment of the United States Constitution and Article 26 of the Maryland Declaration of Rights?

II.   Did the circuit court err by denying appellant's trial motion to exclude the City of Baltimore paycheck to appellant found in the Cadillac on the basis of hearsay?

For the following reasons, we affirm the judgment of the circuit court.

## FACTS AND PROCEEDINGS

Appellant was arrested for possession of marijuana by Detective Steven Mahan of the Baltimore City Police Department. While appellant was in his custody, the detective observed a vehicle with suspected marijuana in plain view that he had reason to believe had been driven by appellant. He searched the vehicle and found a firearm in the center console next to a combined paycheck and pay-stub (collectively, "the paycheck") in appellant's name. Appellant was charged with possession of marijuana along with the firearm charges.

Before trial, appellant moved to suppress the marijuana found inside the vehicle, the handgun, and the remote and the keys to the vehicle. At the suppression hearing, Detective Mahan testified to the following:

On the evening of June 30, 2007, he was working security as a second job for Central Parking Agency at a garage located at 414 Water Street in Baltimore, Maryland. At approximately 10:20 p.m., he observed, from approximately ten or fifteen feet away, appellant and Scott Tanner, walking down a garage ramp toward him "drinking and smoking a brown hand-rolled cigar." He saw appellant pass the cigar to Tanner, and both were smoking it. Upon seeing Detective Mahan, Tanner

dropped the cigar saying, "Yo, the police." Appellant and Tanner also poured out their drinks.

Detective Mahan placed them under arrest, handcuffed them, and searched them. He found a remote along with a set of keys to a Cadillac on appellant and a set of keys to a Lexus on Tanner. He also recovered the cigar.

After advising both men of their *Miranda* rights, Detective Mahan asked Tanner where he parked his car. Tanner told him that "he drove in with the Lexus;" appellant said that "he drove in with Mr. Tanner." Detective Mahan, with both men in his vehicle, then drove to locate Tanner's vehicle in the garage. Tanner identified his vehicle when they came to it.

Detective Mahan's testimony on direct examination as to the sequence of events after Tanner identified his vehicle was somewhat inconsistent with his testimony on re-direct examination. On direct examination, Detective Mahan testified that, at this point in time, he separated the men, and, after being separated from appellant, Tanner told him that "he drove the Lexus and that his friend, [appellant], drove the Cadillac in behind him." Tanner identified the Cadillac that was parked next to the Lexus as appellant's vehicle.

Detective Mahan "hit ... either the panic button or the lock button" on the remote to the Cadillac, "and the horn sounded." He looked inside the Cadillac, and, in the center console, "in plain view" saw "a clear sandwich bag that contained a green substance of suspected marijuana."

Detective Mahan testified that he then performed a "search inventory to tow." Inside the vehicle's center console, he found a "Hungrade (sic) .9 millimeter handgun" and "a pay-check stub" in appellant's name.

On re-direct examination, Detective Mahan testified as follows:

[Prosecutor]: And when in the sequence of events did ... Mr. Tanner [ ] advise you that [appellant] drove the Cadillac that was next to his car?

Detective Mahan:  Once I was able to separate them and had some distance between Mr. Tanner and I, when he was out of earshot of Mr. Fair.

Q.  Was that before or after you looked in the Cadillac and saw the marijuana?

A.  I believe it was after.

Q.  Okay.  And was it before or after you hit the button?

A.  I think it was after.  I believe it was after.

The motion court denied the motion to suppress.  It concluded that the search of appellant incident to his arrest for possession of the marijuana cigar "was constitutionally permitted," and that "[l]ooking in the Cadillac, opening it, and seizing the marijuana visible from the exterior of the Cadillac was [ ] constitutionally protected."  According to the motion court, "[t]he question [was] really whether opening the console where the gun was found [was] also constitutionally permitted."

The court, through the following analysis, determined that the search of the console was permissible:

The facts suggest strongly that Detective Mahan had every intention of towing the cars of the arrestees, Tanner and [appellant], before he ever saw the cars or before he ever observed the marijuana in [appellant's] car.

When the detective and the two arrestees were still downstairs in the garage away from [appellant's] car, Detective Mahan seized the keys with the remote.  Both Mr. Tanner and [appellant] had keys to different cars and Detective Mahan asked both about how they got there and quizzed Tanner out of [appellant's] presence about how [he] got there.  So it is clear that Detective Mahan was focused on finding those cars, given the policy of Central Parking Garage to have them removed.

In addition, as to the Defendant's car, the need for it to be towed was heightened when Detective Mahan observed the marijuana in plain view in the car.

The bottom line here is that there is no subterfuge. Detective Mahan was not engaged in subterfuge to search the Defendant's car. Rather, knowing that the car was going to be towed, either because that was the policy of Central Parking or because contraband had been found there, Detective Mahan knew the car was going to be towed.

Given this knowledge, Detective Mahan's opening of the console where the gun was observed was constitutionally permissible, the inventory search was necessary to protect the police from claims and disputes over lost property, and to protect the Defendant's property while it remained in police custody. Therefore, there was a bona fide inventory and not an investigative search.

Before trial, appellant moved to exclude from evidence the paycheck based on hearsay, arguing that it would be offered to prove the truth of its contents, most specifically, the date. The State argued that it was "going to be arguing that ... because the piece of paper was found with his name and the paycheck and everything with the gun, that he had to have gone in that console at some point with the piece of paper there, not that he definitively owns the car or anything else." Defense counsel explained that use of the paycheck to prove the date it was written was hearsay, unless the check came in pursuant to a business records exception. The circuit court held that "[t]he document is not being offered for the truth of the matter asserted, it's being offered to show the Defendant's possessory interest in the vehicle," and denied the motion.

Appellant then moved to redact the date on the paycheck, which the court denied without comment.

Detective Mahan was the State's only witness at trial, and he testified substantially as he had at the suppression hearing. In addition to his previous testimony, he testified that the Cadillac was registered to Dashae Mariano, but that it was not considered stolen.

On direct examination, the State questioned the detective on finding the paycheck in the center console. He testified to finding the paycheck, but, at that time, did not testify as to the

date on the paycheck. The prosecutor then moved the paycheck into evidence. At that time, defense counsel stated, "And Your Honor, I would just renew my objection." The court admitted the paycheck into evidence.

On redirect-examination, the prosecutor returned to the topic of the paycheck and the following exchange took place:

[Prosecutor]: And Mr. Fair at some point had left his paycheck in there?

[Detective Mahan]: Yes, ma'am.

[Prosecutor]: And what is the date on the paycheck?

. . .

[Defense counsel]: Your honor, just object for the record, pursuant to bench conference, Your Honor, that we already had.

[The Court]: Overruled.

. . .

[Detective Mahan]: The pay period began 6/18/07 through 6/24/07, the pay date was 6/29/07.

[Prosecutor]: The day before this incident?

[Detective Mahan]: Yes, ma'am.

It was stipulated that appellant "is prohibited from possessing a firearm or ammunition because of a prior disqualifying crime;" that the "gun in this case was found to be operable;" and that "the substance recovered and tested was marijuana."

In closing, the prosecutor argued to the jury:

Nobody else had access to that vehicle that night. The only person who had access to that vehicle is Mr. Arnell Fair. Mr. Arnell Fair, who knew that there was a gun in that car because he was trying to distance himself. Mr. Arnell Fair who knew that there was a gun in there when he put his paycheck in there within the last 24 hours, because the paycheck was dated the day before and it had to be within 24 hours.

8

The jury found appellant guilty of the counts of possession of marijuana and possession of a firearm by a convicted felon. He noted this timely appeal.

## DISCUSSION

### I.

### Suppression Motion

We are first asked to consider whether the circuit court erred by denying appellant's pretrial motion to suppress the keys and the remote to the Cadillac automobile, the marijuana, and the firearm found in the Cadillac under the Fourth Amendment of the United States Constitution and Article 26 of the Maryland Declaration of Rights.

In *Daniels v. State,* 172 Md.App. 75, 87, 913 A.2d 617 (2006), we addressed the standard of review of rulings on suppression motions:

> In reviewing the denial of a motion to suppress evidence under the Fourth Amendment, we look only to the record of the suppression hearing and do not consider any evidence adduced at trial. *Ferris v. State,* 355 Md. 356, 368, 735 A.2d 491 (1999). We extend great deference to the findings of the hearing court with respect to first-level findings of fact and the credibility of witnesses unless it is shown that the court's findings are clearly erroneous. *Reynolds v. State,* 130 Md.App. 304, 313, 746 A.2d 422 (1999), *cert. denied,* 358 Md. 383, 749 A.2d 173 (2000), *cert. denied,* 531 U.S. 874, 121 S.Ct. 178, 148 L.Ed.2d 122 (2000). Moreover, we view those findings of fact, and indeed the record as a whole, in the light most favorable to the State. *Id.* We review the court's legal conclusions *de novo,* however, making our own independent constitutional evaluation as to whether the officers' encounter with appellant was lawful. *Id.*

The circuit court, in its analysis, addressed the propriety of Detective Mahan's search of the Cadillac and whether it was an inventory or investigative search. However, appellant's argument, at trial and on appeal, centers on whether Detective

Mahan had the right to utilize the keys and remote of the Cadillac that were in his possession as a result of the initial arrest to establish a connection between the appellant and the Cadillac.

At the pre-trial suppression hearing, defense counsel argued:

> What happened here is the detective sees that both of these individuals have keys on them and then the detective attempts to really do a further investigation based upon what's found on that person. Instead of really doing a caretaking function and making sure that whatever personal items on him are catalogued and turned in to protect the Defendant, he goes on a further search. He admits that he does that. That, in fact, he was looking for more fruits of some crime and then they go onto the third floor.
>
> Once they get to the third floor, Your Honor, the officer states that, in fact, that it was some testimony from the co-Defendant that causes him to look in the window. He also states that, in fact, that it was marijuana that was in plain view.
>
> Nonetheless, Your Honor, what the officer does to connect this particular—to connect the possession of the marijuana with Mr. Fair is he presses the button on the remote control. At that point, he realizes that, in fact, that the key and the remote that was taken from Arnell Fair is, in fact, has a connection with this particular car.
>
> * * *
>
> [I]f the personal items that he takes off of Mr. Fair are not . . . incriminating items, such as keys, such as a car remote, then the officer does not have a right to then take that car remote or take that key and go on some whole expedition in terms of another search.

In essence, appellant argues that he retained a Fourth Amendment expectation of privacy in the keys and remote, and that, in the absence of a warrant, the detective's role with respect to them was only that of caretaker.

■ First, appellant claims that his Fourth Amendment rights were violated when he was taken to locate Tanner's vehicle after he was arrested and given his *Miranda* rights. We disagree. Because the detective would be responsible for having Tanner's vehicle towed, locating that vehicle was appropriate. Viewing the record in the light most favorable to the State, Tanner voluntarily directed Detective Mahan to where his vehicle was after having been advised that he had the right to remain silent. That appellant was also taken to the location of Tanner's car was in no way a violation of appellant's rights. Appellant had, and apparently exercised, a continuing right to remain silent, but, once he was arrested, he was in Detective Mahan's custody and simply along for the ride.

■ The second alleged violation of appellant's Fourth Amendment rights is related to Detective Mahan's utilizing the keys and remote already in his possession from the search incident to appellant's arrest to determine whether the vehicle containing marijuana in plain view was appellant's vehicle and to gain access to the vehicle.

Appellant argues that Detective Mahan was only in possession of the keys and remote as part of his "care taking function" and that the keys and remote could not be utilized in an investigation unrelated to his initial arrest. The State argues that the use of the keys and remote was justified under *Holland v. State*, 122 Md.App. 532, 539, 713 A.2d 364, *cert. denied*, 351 Md. 662, 719 A.2d 1262 (1998), where we stated:

When the property is taken from the arrestee, the Fourth Amendment intrusion is a *fait accompli.* When, hours later, a crime lab technician picks up a gun from a storage locker to check it out ballistically, that is not a fresh Fourth Amendment intrusion requiring either a fresh exigency or a warrant for its justification. The danger of destruction is at an end once an arrestee's property has been seized. That is the seizure, and the only seizure, that has Fourth Amendment significance. The property may then be dusted for fingerprints, examined for bloodstains or DNA, checked for

serial numbers, or otherwise processed on a more leisurely basis as an investigation unfolds. Every time that an item, already in police hands, is physically picked up and examined or reexamined, that is not a fresh Fourth Amendment intrusion requiring a fresh justification.

In *Holland*, we concluded that the Fourth Amendment intrusion is complete when property is taken from an arrestee, and further examination and processing of that evidence does not violate Fourth Amendment protections. *Id.* at 540, 713 A.2d 364. Likewise, in *Wallace v. State,* 373 Md. 69, 98, 816 A.2d 883 (2003), the Court of Appeals held that

an incarcerated individual, generally, does not have a reasonable or legitimate expectation of privacy in property legally seized and lawfully stored in police custody by law enforcement officials. Subsequent searches or seizures of that property by law enforcement officials normally do not violate that individual's Fourth Amendment protections. . . .

At issue here is not a "subsequent search" of the keys and remote. Therefore, we need not decide whether *Holland* and *Wallace* would authorize the use of keys included among the inventoried belongings of an arrestee to carry out a search of a place or an automobile without probable cause to obtain a warrant. As we explain, a warrant was not necessary to search the vehicle in this case.

Clearly, the focus of the investigation shifted from the original violation to the marijuana inside the vehicle when Detective Mahan observed the marijuana in plain view inside the Cadillac next to Tanner's vehicle. In *State v. Cabral,* 159 Md.App. 354, 372–73, 859 A.2d 285, (2004), we explained:

A warrantless search of a vehicle is permitted if there is probable cause to believe that the vehicle contains contraband. In general, the automobile exception to the warrant requirement is premised upon the exigencies associated with the mobility of a vehicle, and the diminished expectation of privacy with regard to a vehicle.

(Internal citations and quotations omitted.)

Moreover, in *England v. State,* 274 Md. 264, 272–273, 334 A.2d 98 (1975), the Court of Appeals stated that "there is no

absolute requirement that an occupied car be stopped on the 'open highway' to invoke the 'automobile exception.'" (Citing *Scales v. State*, 13 Md.App. 474, 481–82, 284 A.2d 45 (1971) (search of an unoccupied automobile on apartment house parking lot); *United States v. Church*, 490 F.2d 353, 354–55 (9th Cir.1973), *cert. denied*, 416 U.S. 983, 94 S.Ct. 2385, 40 L.Ed.2d 760 (1974) (search of an unoccupied automobile parked on public street); *United States v. Cohn*, 472 F.2d 290, 292 (9th Cir.1973) (unoccupied automobile parked on public street)).

The Cadillac was parked directly next to Tanner's vehicle. Tanner and appellant had just been arrested for smoking marijuana. Either before or after the suspected marijuana was observed in plain view, Tanner identified the Cadillac as the vehicle appellant was driving. That information was consistent with the fact that Detective Mahan had confiscated keys to a Cadillac from appellant incident to his earlier arrest. Clearly, Detective Mahan had probable cause to believe that the Cadillac was driven by appellant, and, had he not already been under arrest, to arrest him and search the Cadillac under the automobile exception to the warrant requirement. *See Nair v. State*, 51 Md.App. 234, 237, 442 A.2d 196 (1982) (A warrantless search of an automobile was proper where police were informed that the vehicle contained illegal firearms that were to be sold that day.); *United States v. Newbourn*, 600 F.2d 452, 454 (4th Cir.1979) (Upholding the warrantless search of the trunk of a vehicle loaded with stolen firearms under the automobile exception to the warrant requirement); *Jarrell v. State*, 36 Md.App. 371, 374, 373 A.2d 975 (1977) (Upholding the warrantless search of a vehicle for marijuana upon receiving information that a sale was to occur within two hours.).

Detective Mahan did not have to effect an arrest or physically seize the keys and remote because they were already in his possession. Under these circumstances, Detective Mahan had the right, without a warrant, to utilize the Cadillac keys and remote already in his possession to confirm his belief that the vehicle had been driven by appellant and to gain access to the vehicle and carry out a search.

 

## II.

### Hearsay Question

We next consider whether the circuit court erred by admitting the paycheck issued to appellant by the Mayor and City Council of Baltimore's Central Payroll Division that was found in the center console of the Cadillac. Appellant argues that the paycheck should have been excluded as hearsay. To answer the question posed, a review of Maryland hearsay law and the doctrine of implied assertions is in order.

At common law, "the hearsay rule applie[d] when the probative value of the declarant's statement rests on the out-of-court declarant's sincerity and accuracy." McLain, *Maryland Evidence*, § 801:1(b)(i). At common law, a statement could be deemed a hearsay statement if it was being offered to prove its literal contents or to prove an assertion which the utterance implied. *See* McLain at § 801:4(a).

In *Stoddard v. State*, 389 Md. 681, 691, 887 A.2d 564 (2005), the Court of Appeals summarized the English case of *Wright v. Doe d. Tatham*, 112 Eng. Rep. 488 (Exch. Ch. 1837) and 47 Rev. Rep. 136 (H.L.1838), which the Court described as "[t]he starting point for a discussion of the implied assertion doctrine." It explained, *id.:*

> The case [*Wright v. Doe d. Tatham* ] involved a will and the competency of the testator. The decedent Marsden had left his estate to his steward Wright. Marsden's heir at law, Admiral Tatham, challenged the will on grounds of testamentary incapacity. In defense of the will, before the Court of King's Bench, Wright sought to introduce several letters that Marsden had received from various correspondents. One letter concerned a legal dispute, three concerned business or politics, one thanked Marsden for having appointed the writer to a curate ship, and one described a cousin's voyage to America. *Wright,* 112 Eng. Rep. 490–92. Wright did not seek to prove the truth of any explicit factual statement within the letters. Wright argued that the letters were composed in such a way as to indicate that their writers believed Marsden sane and of normal intelligence.

From the writers' belief in Marsden's competence, Wright argued, one could infer that Marsden was competent. The letters were excluded as hearsay. On appeal in the Exchequer Chamber, Baron Parke explained as follows:

"Proof of a particular fact ... implying a statement or opinion of a third party on the matter in issue, is inadmissable in all cases where such a statement or opinion not on oath would be of itself inadmissable; and, therefore, in this case the letters which are offered only to prove the competence of the testator, that is the truth of the implied statements therein contained, were properly rejected, as the mere statement or opinion of the writer would certainly have been inadmissable."

*Id.* at 516–17.

In the testamentary capacity case of *Waters v. Waters,* 35 Md. 531, 543 (1872), the Court of Appeals considered whether two letters written by a tenant to the testator were admissible to show "the manner in which the testator was treated, in regard to matters of business, at the time when they were written, by one well acquainted with him, and for a long time his tenant, and were confirmatory of the testimony given by the writer of them, in regard to the sanity of the testator, and his competency to transact business." The Court "examined with much care the case of *Wright v. Doe, dem. Tatham,* 7 Ad. & El. 313–408," "and the same case on appeal," and stated that it "yield[s its] unqualified assent to the rule of evidence established in that case." *Id.* at 544–45. The Court held that "it is quite clear that the acts and sayings of third persons with reference to [the testator], even though they might be construed into an expression on their part of an opinion or belief touching his mental capacity, cannot be admitted in evidence; unless connected with some act on his part which indicates his competency or incompetency." *Id.* at 543–44.

In 1973, the Federal Rules of Evidence were adopted, including Article VIII, Hearsay. Rule 801, which provides definitions applicable to the chapter, states, in part:

Rule 801. Definitions

The following definitions apply under this article:

(a) Statement. A "statement" is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion.

(b) Declarant. A "declarant" is a person who makes a statement.

(c) Hearsay. "Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

. . .

The Notes of the Advisory Committee on Rules provide, in part:

Subdivision (a). The definition of "statement" assumes importance because the term is used in the definition of hearsay in subdivision (c). The effect of the definition of "statement" is to exclude from the operation of the hearsay rule all evidence of conduct, verbal or nonverbal, not intended as an assertion. The key to the definition is that *nothing is an assertion unless intended to be one.*

* * *

Subdivision (c). The definition follows along familiar lines in including only statements offered to prove the truth of the matter asserted. McCormick § 225; 5 Wigmore § 1361, 6 *id.* § 1766. *If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay. Emich Motors Corp. v. General Motors Corp.,* 181 F.2d 70 (7th Cir.1950), *rev'd on other grounds* 340 U.S. 558, 71 S.Ct. 408, 95 L.Ed. 534 [ (1951) ], letters of complaint from customers offered as a reason for cancellation of dealer's franchise, to rebut contention that franchise was revoked for refusal to finance sales through affiliated finance company. The effect is to exclude from hearsay the entire category of "verbal acts" and "verbal parts of an act," in which the statement itself affects the

legal rights of the parties or is a circumstance bearing on conduct affecting their rights.

(Emphasis added.)

After the Federal rules were adopted, but prior to the adoption of the Maryland Rules of Evidence, this Court decided *Best v. State,* 71 Md.App. 422, 526 A.2d 75 (1987). In *Best,* police executed a search and seizure warrant for the premises of 688 Frenchtown Road in Cecil County, Maryland. *Id.* at 425, 526 A.2d 75. While conducting their search, "the telephone in the house rang." *Id.* at 430, 526 A.2d 75. A police detective answered the telephone. At trial, the detective testified to the conversation that ensued, *id.* at 430–31, 526 A.2d 75:

> "I picked up 'phone. I said, "Hello." She said, "Horace?" I says, "Yeah." She says, "This is Debbie. I got the money that I owe you" or something to that nature.
>
> . . .
>
> She stated her name was Debbie. She said, "This is Debbie." She said, "I got what I owe you. Can I get the, can I get the same thing that I got last time?" And I said, "Yeah." I says, "You got the money?" And she says, "Yeah. Can I get a gram?" I says, "Okay." She said, "I'll be right over." And she said she was leaving from Delaware Park. At that point, that was the end of the 'phone call."

He went on to testify that, "[s]hortly after the conclusion of this telephone conversation, a woman named 'Debbie' arrived at 688 Frenchtown Road looking for appellant." *Id.* at 431, 526 A.2d 75.

Best argued that the detective's "testimony as to the substance of the telephone conversation was inadmissible hearsay." *Id.* The Court held, *id.* at 432, 526 A.2d 75:

> "Hearsay may be defined as an out-of-court assertion offered in court for the truth of the matter asserted, resting for its value upon the credibility of the out-of-court asserter." *Ali v. State,* 67 Md.App. 339, 343, 507 A.2d 648 (1986). [The detective's] testimony concerning his conversation with Debbie from Delaware *was not offered in court for the truth*

*of what Debbie, the out-of-court asserter, said;* rather, it was offered as evidence of the fact that the call was made. As such, [the detective's] testimony was not hearsay at all, but evidence of a verbal act. *United States v. Hansbrough,* 450 F.2d 328, 329 (5th Cir.1971). Testimony concerning telephone calls made to or received at a particular location has been held admissible frequently in prosecutions for bookmaking and other gambling activities, where such testimony is offered *not to establish the truth of what was said over the telephone,* but as evidence that the calls were made to the location for the purpose of placing bets. *Courtney v. State,* 187 Md. 1, 6, 48 A.2d 430 (1946). *See generally* Annot., 13 A.L.R.2d 1409 (1950 & Later Case Service Supp. 1973), and cases there cited. Analogously, [the detective's] testimony about the phone call in this case was offered as evidence that the call was made for the purpose of arranging an illegal drug transaction. The trial court did not err in admitting [the detective's] testimony.

(Emphasis added.)

Under *Best,* where testimony was not being offered to "establish the truth of what was said" but as "evidence" of a verbal act, such testimony did not meet the definition of a hearsay statement.

After *Best,* the Court of Appeals adopted the Maryland Rules of Evidence which became effective on July 1, 1994, and which included Chapter 800, entitled "Hearsay." The definitions applicable to Chapter 800 are set forth in Rule 5–801:

(a) **Statement.** A "statement" is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion.

(b) **Declarant.** A "declarant" is a person who makes a statement.

(c) **Hearsay.** "Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

The Committee Note to Rule 5–801 provides:

This Rule does not attempt to define "assertion," a concept best left to development in the case law. The fact that proffered evidence is in the form of a question or something other than a narrative statement, however, does not necessarily preclude its being an assertion. The Rule also does not attempt to define when an assertion, such as a verbal act, is offered for something other than its truth.

After adoption of the Maryland Rules of Evidence, this Court decided *Holland v. State*, 122 Md.App. 532, 713 A.2d 364 (1998). In that case, a witness testified that, while in a motel room with appellant and others, either appellant or one of his companions announced, "We're going down the strip to sell." *Id.* at 545, 713 A.2d 364. The defense objected, arguing that the statement was hearsay. *Id.*

In its analysis, the *Holland* Court explored the definition of "assertion," *id.* at 543–44, 713 A.2d 364:

To qualify as hearsay, the words recounted in court must, for starters, constitute an assertion or statement of a fact. Many out-of-court utterances are self-evidently not assertions. If a witness testifies to the out-of-court inquiry, "What time is it," that inquiry is obviously not an assertion of anything. For an out-of-court utterance to qualify as an assertion, it generally must be in the indicative or declarative mood, rather than in the interrogative mood, the imperative mood, or the subjunctive mood. An out-of-court assertion of a fact may be true or untrue. For that reason, its admissibility in evidence is problematic if offered to prove that fact. An out-of-court inquiry, "What time is it?" can be, by its very nature, neither true nor untrue and there is, therefore, no such credibility problem. The out-of-court command, "Stop!" can be, by its very nature, neither true nor untrue and there is, therefore, no such credibility problem.

The Court ultimately held, *id.* at 546, 713 A.2d 364:

The words were offered as circumstantial evidence that either the appellant or the other codefendant who uttered them along with others who heard the words were privy to a

concerted plan to sell narcotics—on the strip or elsewhere, immediately or after the coast was clear. The very uttering of the words helped to show the state of mind of the one who uttered them and/or of others who heard them. As circumstantial evidence used to prove that collective state of mind, to wit, the conspiracy, the words were non-hearsay. *See* L. McLain, Maryland Evidence, § 801.10.

In 2005, the Court of Appeals decided *Stoddard v. State,* 389 Md. 681, 887 A.2d 564 (2005). In that case, Erik Stoddard, the defendant, "was convicted of second degree murder and child abuse" resulting in the death of Calen DiRubbo. *Id.* at 683, 887 A.2d 564. The evidence showed that Stoddard had been supervising DiRubbo and Jasmine Pritchett when the alleged incident occurred. *Id.* at 684, 887 A.2d 564. Jasmine's mother testified, over appellant's objection, that her daughter, after the incident, "asked [her] if Erik was going to get her." *Id.* at 685, 887 A.2d 564. The State offered "this utterance as evidence that the child had witnessed Stoddard commit the murder," *id.* at 683, 887 A.2d 564, and the defendant argued that the statement was inadmissible hearsay. *Id.* at 685, 887 A.2d 564. The Court considered "whether the trial court erred in admitting testimony recounting an out-of-court utterance allegedly made by a non-testifying eighteen month old child." *Id.* at 683, 887 A.2d 564.

Before deciding this issue, the Court summarized the common law view of the "implied assertion doctrine" stating "that[,] where a declarant's out-of-court words imply a belief in the truth of X, such words are hearsay if offered to prove that X is true." *Id.* at 692, 887 A.2d 564. It explained, "In its original *Wright v. Tatham* form, the doctrine did not inquire into the declarant's intent-beliefs communicated accidentally by implication are as much 'implied assertions' as beliefs expressed purposefully in an indirect manner. . . . [T]he doctrine also did not distinguish between words and non-verbal conduct." *Id.* at 692–93, 887 A.2d 564.

According to the Court, "the 1973 adoption of the Federal Rules of Evidence, and the subsequent adoption by numerous

states—including this State—of substantially similar rules" was "[p]erhaps the most significant development in the American judicial treatment of implied assertions." *Id.* at 693, 887 A.2d 564. With the adoption of Federal Rule of Evidence 801(a) and its Advisory Committee Note, the drafters of the Federal Rules "expressly abolished the implied assertions doctrine with respect to non-verbal conduct not intended by the actor as a communication. As to words, the drafters were more equivocal while the Advisory Committee note to Fed. R.Evid. 801(a) states that 'nothing is an assertion unless intended to be one.'" *Id.*

Recognizing that "[t]he federal Advisory Committee note has been the source of disagreement in the courts and among scholars," *id.* at 694, 887 A.2d 564, the Court then addressed the application of the implied assertion doctrine in Maryland, *id.* at 695, 887 A.2d 564:

> In the testamentary capacity case of *Waters v. Waters,* 35 Md. 531 (1872), this Court considered whether certain letters were admissible to show "the manner in which the testator was treated, in regard to matters of business ... by one well acquainted with him," in order to establish the letter-writer's opinions "in regard to the sanity of the testator, and his competency to transact business." *Id.* at 543. In excluding the letters, the Court adopted the rule laid down in *Wright v. Tatham,* which had presented substantially the same factual scenario.

Although "Maryland Rules 5–801(a), 5–801(c), and 5–802 are identical to the federal counterparts," Maryland has adopted "the rule laid down in *Wright v. Tatham,*" while "many federal courts have rejected the *Wright v. Tatham* proposition that out-of-court words are hearsay when offered to prove facts that the declarant impliedly believed but did not intend to communicate." *Id.*

The *Stoddard* Court pointed out that "[t]he Committee note to Md. Rule 5–801 departs substantially from its federal counterpart. Rather than restricting the definition of 'assertion,' the note 'does not attempt to define "assertion," a

concept best left to development in the case law.' " *Id.* at 696, 887 A.2d 564. Thus, the Court concluded, "[i]t is clear that in adopting the Maryland Rule, this Court did not intend to adopt the federal Advisory Committee's view that 'nothing is an assertion unless intended to be one,' but rather intended to leave to case law the viability of the rule of *Wright v. Tatham.*" *Id.*

Turning to whether the "unintentional implications of words should remain within the definition of hearsay," the Court stated, *id.* at 696–97, 887 A.2d 564:

> [W]e first look to the theory underlying the rule against hearsay in general. In contrast to the intent-based approach of the federal Advisory Committee, scholars have focused on the veracity of the declarant and have identified four factors (sometimes termed "testimonial inferences"): (1) sincerity (the danger of fabrication); (2) narration (the danger of ambiguity); (3) perception (the danger of inaccurate observation); and (4) memory (the danger of faulty recollection).[ ]
>
> Each of the four inferences is strengthened by the requirement that testimony be given in court, under oath, and subject to cross-examination.....
>
> \* \* \*
>
> When, in lieu of in-court, sworn testimony, a fact is presented to the fact finder from an out-of-court declarant, the four inferences are undermined considerably. The declarant's bare words reveal little or nothing about the circumstances under which the declarant came to believe the factual proposition communicated, nor about the accuracy of the declarant's memory. They do not indicate the declarant's tone or demeanor, the circumstances surrounding the utterance, or the motives which might have influenced the declarant to speak falsely. It is cross-examination, combined with the safeguards of presence and oath, that shores up the inferences of perception, memory, narration, and sincerity.

(Some internal citations omitted.)

The Court rejected the rationale underlying the Federal Rule, *id.* at 703–04, 887 A.2d 564:

We conclude that, with respect to the four testimonial inferences, out-of-court words offered for the truth of unintentional implications are not different substantially from out-of-court words offered for the truth of intentional communications. The declarant's lack of intent to communicate the implied proposition does not increase the reliability of the declarant's words in a degree sufficient to justify exemption from the hearsay rule. Said another way, we conclude that a declarant's lack of intent to communicate a belief in the truth of a particular proposition is irrelevant to the determination of whether the words are hearsay when offered to prove the truth of that proposition.

We hold that where the probative value of words, as offered, depends on the declarant having communicated a factual proposition, the words constitute an "assertion" of that proposition. The declarant's intent *vel non* to communicate the proposition is irrelevant. If the words are uttered out of court, then offered in court to prove the truth of the proposition—i.e. of the "matter asserted"—they are hearsay under our rules.

Returning to the case before it, the *Stoddard* Court treated the utterance, as an implied assertion, stating, in part, *id.* at 690, 887 A.2d 564:

Contrary to the State's contention, the words are not relevant if offered merely to prove that Jasmine was afraid of Stoddard. Jasmine's fear of Stoddard is irrelevant unless it stems from a belief that she had seen Stoddard assault Calen. Although it is conceivable that Jasmine's fear, taken together with her presence during the relevant time frame, was circumstantial evidence that Jasmine witnessed Stoddard assault Calen, this conceptualization is a distinction without a difference. Jasmine's fear of Stoddard is relevant only if it is rational, i.e., only if it stems from a real-world condition or event. To rationally fear Erik Stoddard is to believe the proposition, "I have a reason to fear Erik Stoddard." Jasmine's belief in this proposition is relevant only if the "reason" at issue is her having witnessed Erik assaulting Calen. Thus, in offering Jasmine's fear as evi-

dence, the State implicitly would be offering Jasmine's belief in the proposition "I have a reason to fear Erik Stoddard and that reason is that I saw him assault Calen."

The Court concluded that Jasmine's statement should have been excluded as hearsay:

> Jasmine's out-of-court question, repeated in court by her mother with minimal information as to its context, is unreliable as evidence that Jasmine had witnessed Stoddard assault Calen. The question is untested as to narration/ambiguity and sincerity. Its relationship to the factual proposition it supposedly implies is untested as to ambiguity. Jasmine's belief in the implied proposition, even if genuine, is untested as to memory and perception. The dangers that arose from the State's use of this question demonstrate the continued utility of the common law approach to hearsay.

*Id.* at 712, 887 A.2d 564.

After deciding *Stoddard,* the Court of Appeals decided *Bernadyn v. State,* 390 Md. 1, 887 A.2d 602 (2005) (Wilner, J., and Battaglia, J., dissenting). In *Bernadyn,* the defendant was charged with possession and intent to distribute marijuana and maintaining a common nuisance after police officers executed a search and seizure warrant at 2024 Morgan Street. *Id.* at 3, 887 A.2d 602. In addition to marijuana, the officers seized a "Johns Hopkins Bayview Physicians medical bill dated August 16, 2001, containing the language: 'Responsible party: Michael Bernadyn, Jr., 2024 Morgan Street, Edgewood, Maryland 21040.' " *Id.* at 4, 887 A.2d 602.

At trial, part of Bernadyn's defense was that he did not live at the address where the drugs were found. *Id.* To prove that Bernadyn did reside at the address where the drugs were found, the State, over objection, introduced into evidence the medical bill. In closing argument, the State argued in part, *id.* at 5, 887 A.2d 602:

> They pick a piece of evidence that shows who lives there, and what you have is a bill from Johns Hopkins Bayview Physicians, a statement date of August 16, 2001. That's

almost two weeks before the warrant, but it's for services that are provided back in June of 2001.

Now we go back almost two months prior to the warrant being served. So I guess defense counsel and the defendant would have you believe that Johns Hopkins randomly picked an address of 2024 and just happened to send it there, and that's where the defendant lived. It doesn't happen, because you also—look, this is a bill, is what it is, and I am sure that any institution is going to make sure they have the right address when they want to get paid.

The defendant was convicted on all counts. *Id.* at 7, 887 A.2d 602. This Court affirmed and the Court of Appeals granted Bernadyn's petition for *certiorari* "to consider whether a medical bill seized by police at 2024 Morgan Street in Edgewood, Maryland, and addressed to 'Michael Bernadyn, 2024 Morgan Street, Edgewood, Maryland 21040,' when used by the State to establish that Bernadyn lived at that address, constitutes inadmissible hearsay." *Id.* at 3, 887 A.2d 602.

The Court concluded, *id.* at 11, 887 A.2d 602:

Our discussion and reasoning in *Stoddard* determines the outcome of this case. The bill contained two significant items: Bernadyn's name, and his address. The State did not argue simply that an item bearing Bernadyn's name was found in the house and that Bernadyn probably resided at the house. Rather, the State argued that the bill itself was "a piece of evidence that shows who lives there." In particular, the State suggested that Bayview Physicians had Bernadyn's correct address because "any institution is going to make sure they have the right address when they want to get paid."

In order to accept the words "Michael Bernadyn, Jr., 2024 Morgan Street, Edgewood, Maryland 21040" as proof that Bernadyn lived at that address, the jury needed to reach two conclusions. It needed to conclude, first, that Bayview Physicians wrote those words because it believed Bernadyn to live at that address, and second, that Bayview Physicians was accurate in that belief. As used, the probative value of

the words depended on Bayview Physicians having communicated the proposition that Michael Bernadyn lived at 2024 Morgan Street. The words therefore constituted a "written assertion"—and hence, under Md. Rule 5–801(a), a "statement"—that Michael Bernadyn lived at 2024 Morgan Street. When used to prove the truth of that assertion, the bill was hearsay under Md. Rule 5–801(c), because it contained "a statement . . . offered in evidence to prove the truth of the matter asserted."

As to whether the bill could be considered non-hearsay, the Court stated, *id.* at 14–15, 887 A.2d 602:

> The State also relies on the Court of Special Appeals' alternative rationale, that the bill was offered *not to establish the truth of its contents*, but rather for its probative value as circumstantial evidence connecting Bernadyn to the residence wherein he, the bill, and the drugs were all found. Pointing to case law from other jurisdictions in which courts have admitted documents as circumstantial evidence tending to prove a defendant's connection with a location or with other people, the State maintains that the existence of an address on the bill makes no difference in the analysis. The State ignores the fact that evidence can serve more than one purpose. If the proponent of a statement claims to offer the evidence for a purpose other than its truth, but also offers the statement to prove the truth of a matter asserted therein, the court should either exclude the evidence or make clear that the evidence is admitted for a limited purpose. Defense counsel is then on notice that the evidence is admissible, albeit for a limited purpose, and may then request a limiting instruction.

(Emphasis added.)

Discussing the Court's conclusion in *Bernadyn*, Professor McLain, in McLain, *Maryland Evidence*, § 801:4(2)(c)(I) (2001, 2006 Sup.), wrote:

> Under the majority's chosen *Wright v. Tatham* approach, there was no possible way for the court to find the name and address to be nonhearsay, when the evidence had been

admitted to prove that Bernadyn actually lived there, because Hopkins' billing department believed he did.

The majority's opinion suggests that it would have found differently, had the State offered the bill for the limited purpose of showing that something with the same name as the defendant was found in the house. Under this approach, like that followed by many cases concerning, e.g. that someone using the same name as the defendant signed a hotel register—the evidence has probative value as circumstantial evidence making it more likely than it would be without that evidence (the Md. Rule 5–401 relevance test) that the person signing the register of named in the correspondence was the defendant. This is the procedure that the State is best advised to follow in the future. A judge admitting evidence for such a purpose is cautioned to give a limiting instruction *sua sponte* if one is not requested.

Absent such a limited proffer, the majority holds that the evidence must be shown to fall within a hearsay exception. . . .

(Footnotes omitted.)

After the Court of Appeals' decision in *Bernadyn,* a divided panel of this Court decided *Fields v. State,* 168 Md.App. 22, 895 A.2d 339 (Kenney, J., dissenting), *aff'd,* 395 Md. 758, 912 A.2d 637 (2006). In *Fields,* a police detective responded to a report of a shooting at a bowling alley. *Id.* at 29, 895 A.2d 339. He observed that above each bowling lane was a television monitor displaying the names of the purported bowlers and their scores. *Id.* He made a handwritten list, itemizing each bowling lane and the names displayed on the screen for that lane. *Id.* For the screen above lane 22, he recorded the names "Sat Dogg/Bleu/Vino." *Id.*

Before trial began, the defense moved *in limine* to preclude the detective from testifying that the name "Sat Dogg," which was the defendant's nickname, appeared on the screen or from introducing the handwritten list into evidence based on hearsay. *Fields,* 168 Md.App. at 29, 895 A.2d 339. Defense counsel argued "that the name 'Sat Dogg' on the screen was

an implied assertion, by an unknown declarant, made out of court, that the [defendant] was present in the bowling alley that night; and that the State was offering the implied assertion in evidence to show its truth." *Id.* The circuit court denied the motion "commenting that there was no reason to think the person who typed the [defendant's] nickname onto the television screen above bowling lane 22 intended that act as an assertion that the [defendant] was present at that location." *Id.* at 30, 895 A.2d 339. The court also denied other objections raised during trial and allowed the evidence to be introduced. *Id.*

On appeal, this Court affirmed but for a different reason than the trial court, *Fields,* 168 Md.App. at 35–37, 895 A.2d 339:

> Returning to the instant case, the reason the trial judge gave for concluding that the evidence that the appellant's nickname was on a television screen in the bowling alley was non-hearsay was incorrect, under *Stoddard.* The trial judge determined that the person who entered the name "Sat Dogg" on the screen did not intend to assert that the appellant was present in the bowling alley. If the words "Sat Dogg" were an implied assertion of the factual proposition that the appellant was present in the bowling alley at the time of the shootings, it would make no difference whether the "declarant" of the words intended to convey that factual proposition. *Stoddard, supra,* 389 Md. at 703–04 [887 A.2d 564].
>
> * * *
>
> The core question here is whether the evidence that the appellant's nickname was on a television screen at bowling lane 22 constituted an implied assertion that the appellant was present in the bowling alley that night, and was offered by the State to show his presence; or whether it was an item of circumstantial crime scene evidence from which reasonable jurors could infer that the appellant was present in the bowling alley that night.

In *Bernadyn, supra,* the Court drew that distinction, and in doing so focused on how and for what purpose the proponent of the evidence (the State) was using it. The Court emphasized that the State in that case did not offer the medical bill merely to show that it was a thing found at the crime scene—a fact from which the jurors could infer that Bernadyn probably lived there. Rather, it offered the item as proof that Bernadyn lived at the residence by showing that Bayview Hospital, an outsider, believed that he lived there, was accurate in that belief, and acted on that belief. The prosecutor in *Bernadyn* "argued that the bill itself was 'a piece of evidence that shows who lived' " at the residence and "suggested that Bayview Physicians had Bernadyn's correct address because 'any institution is going to make sure that they have the right address when they want to get paid.' " 390 Md. at 11 [887 A.2d 602] (quoting from record in that case). The State was using the bill to show that its author, who would have reason to know Bernadyn's address, sent it there, impliedly asserting that Bernadyn lived there.

The *Fields* Court majority concluded "that the evidence that the appellant's nickname was found on a television screen in the bowling alley on the night of the shootings falls into the category of non-assertive circumstantial crime scene evidence." It reasoned, *id.* at 37–38, 895 A.2d 339:

The State called Detective Canales and questioned him about what he found at the bowling alley when he responded to the call of a shooting and what evidence he collected at the scene. Detective Canales testified that he saw names on the screens at the bowling lanes and wrote all of them down on a piece of paper. The prosecutor argued that the appellant's nickname, "Sat Dogg," on the screen at lane 22 was one of several items of evidence at the crime scene that linked the appellant to the scene—including a sweater with his DNA on it, casings from a gun that was under his bed, and a car that looked like his car.

The prosecutor did not attempt to use the evidence of the words "Sat Dogg" on the screen at the bowling alley to

show that a known declarant believed the appellant was present there, had reason to accurately hold that belief, and therefore was impliedly asserting that factual proposition by entering his nickname on the screen. Unlike the probative value of the medical bill in *Bernadyn, supra*, the probative value of the evidence that the appellant's name was on the television screen did not depend upon the belief of the person who typed the name on the screen, or upon the accuracy of that person's belief. The prosecutor did not argue that the person who entered the name "Sat Dogg" on the screen only would have done so if he or she believed that the appellant was present in the bowling alley. Indeed, there was no evidence about that person's belief, because the person was not identified. The prosecutor argued only that the crime scene included a bowling lane with the name "Sat Dogg" written above it.

To be sure, the probative value of the name-on-the-screen evidence was that it had a tendency to show that the appellant was a bowler at the bowling alley that night, and therefore was present at the location of the shootings. Any item at the crime scene that could be connected to the appellant in some way, regardless of the veracity of its source, also would have that probative value. The jurors could have drawn the same inference that the appellant was present at the bowling alley from the evidence that the sweater with his DNA on it was found there.

The appellant's name on the television screen in the bowling alley was not an implied assertion of the factual proposition that the appellant was present at the bowling alley, although it was circumstantial evidence that could be probative of that fact. Because the evidence was not an "assertion," under Rule 5–801(a), it was not a "statement" under that subsection and hence was not hearsay under Rule 5–801(c). It was admissible non-hearsay evidence. Accordingly, the trial court's evidentiary ruling was not in error.

According to the dissent, the presence of Field's nickname

on the lane 22 screen has little, if any, relevance except as an implied assertion that someone known as "Sat Dogg" was bowling on lane 22 on the night in question. But, even assuming that the evidence might be properly introduced for the limited purpose of demonstrating what names Detective Canales observed on the screen, there is no indication that the admission was limited to that purpose or that the trial court saw any need to do so. *Bernadyn*, 390 Md. at 15 [887 A.2d 602].

*Fields*, 168 Md.App. at 49, 895 A.2d 339.

The Court of Appeals "granted *certiorari* ... to consider whether the Court of Special Appeals erred in holding that the petitioner's nickname, 'Sat Dog[g],' which was displayed on a television monitor above a bowling lane, was not hearsay." *Fields v. State*, 395 Md. 758, 759, 912 A.2d 637 (2006). But, "[b]ecause [it held] that even if the court erred with respect to the evidentiary issue, the error was harmless beyond a reasonable doubt, [it did] not reach the issue." *Id.* As a result, *Bernadyn* is the Court of Appeals's last definitive statement on crime scene evidence and implied assertions.

After *Fields*, this Court decided *Garner v. State*, 183 Md. App. 122, 145, 960 A.2d 649 (2008), *aff'd*, 414 Md. 372, 995 A.2d 694 (2010), where we addressed whether an "anonymous telephone caller's question, 'Can I get a 40?' was an implied assertion that the appellant was a seller of cocaine" and whether "it, therefore, fell under the ban of the Rule Against Hearsay."

In *Garner*, the appellant was stopped while driving and arrested for possession of cocaine which was found in his car. *Id.* at 126, 960 A.2d 649. At trial, a police officer testified that "when the appellant's cell phone rang at the station house, [he] answered it and said, 'Hello.' The caller asked, 'Can I get a 40?' but then hung up when [the police officer] asked him for his name." *Id.* The police officer testified that the phone was "ringing non-stop." *Id.* at 134, 960 A.2d 649. A different police officer testified that "the term '40' is a 'common refer-

ence' for four-tenths of a gram of crack cocaine." *Id.* at 126, 960 A.2d 649.

The appellant "moved *in limine* to have the content of the call excluded from evidence" as hearsay. *Id.* at 134, 960 A.2d 649. The motion was denied and the State referred to the phone call in its opening statement and closing argument "as proving precisely the thing that it validly served to prove, to wit, that the appellant was a pusher and not a mere user." *Id.* at 135, 960 A.2d 649.

As the *Garner* Court explained, "Although this brief telephone exchange added little, if anything, to the proof of the appellant's guilt as a possessor, it clearly helped to characterize that possession as commercial in nature and not as simple possession for personal use." *Id.* at 134, 960 A.2d 649.

The Court reviewed previous cases concerning the definition of an "assertion" under Rule 8–501, including *Holland,* 122 Md.App. at 543–44, 713 A.2d 364, and stated:

> It is not an infrequent occurrence that the police, after making arrests at a bookmaking parlor or a gambling den or a place where drugs are sold, will pick up a ringing telephone and field the call. The making of a wager or the purchase of a drug, legally or illegally, is a form of contract. *Little v. State,* 204 Md. 518, 522–23, 105 A.2d 501 (1954). There is an offer and an acceptance. The telephoned words of the would-be bettor or would-be purchaser are frequently categorized, therefore, as verbal parts of acts. *They are not considered to be assertions* and do not fall under the scrutiny of the Rule Against Hearsay.

*Garner,* 183 Md.App. at 140, 960 A.2d 649 (emphasis added.)

Citing this Court's decision in *Best,* 71 Md.App. at 432, 526 A.2d 75, the *Garner* Court stated, *id.* at 142, 960 A.2d 649:

> Judge Karwacki's explanation in *Best* of why the content of the incoming call was non-hearsay remains the definitive analysis.
>
> "Hearsay may be defined as an out-of-court assertion offered in court for the truth of the matter asserted,

resting for its value upon the credibility of the out-of-court asserter." *Ali v. State,* 67 Md.App. 339, 343, 507 A.2d 648 (1986). [The detective's] testimony concerning his conversation with Debbie from Delaware was not offered in court for the truth of what Debbie, the out-of-court asserter, said; rather, it was offered as evidence of the fact that the call was made. As such, [the detective's] testimony was not hearsay at all, but evidence of a verbal act. *United States v. Hansbrough,* 450 F.2d 328, 329 (5th Cir.1971).

Recognizing that, under *Best,* the caller's question in *Garner* would constitute "a verbal part of an act" and, as such, was not hearsay, we then considered whether the statement constituted an implied assertion, *id.* at 145–46, 960 A.2d 649:

If we give *Stoddard* and *Bernadyn* the broad and expansive reading urged by the appellant, the untethered sweep of "implied assertions" could easily embrace the anonymous caller's question in this case. Indeed, a large part of the pre-*Stoddard* and pre-*Bernadyn* constraint on the excessive overuse of the Rule Against Hearsay was the requirement that the out-of-court declaration actually be an assertion. A broad definition of implied assertion, however, as any utterance that can be used by its proponent to prove anything effectively excises the word "assertion" out of every definition of hearsay. It brings into play the very looseness of language (and of thought) that we cautioned against in our *Stoddard v. State,* 157 Md.App. [247] at 273 n. 12 [850 A.2d 406 (2004) ].

The problem, of course, is that the phrase "implied assertion," in widespread use for 150 years, had nothing to do with an action's or an utterance's being assertive. It was simply a poor choice of words to connote the capacity of the action or the utterance to be, circumstantially, the trigger for an inference. The sophisticated may be comfortable with it, but *the very idea of a non-assertive assertion* is going to continue to trip a lot of people up.

(Emphasis supplied [by *Stoddard* Court] ).

If, on the other hand, we read the decisions in *Stoddard* and *Bernadyn* conservatively and as carefully confined to the situations before the Court on those occasions, we would not hesitate to hold the brief telephoned inquiry in this case was non-hearsay and, therefore, admissible. *Stoddard* and *Bernadyn* were not dealing with that variety of non-hearsay frequently described by the academic commentators as "verbal parts of acts." *Stoddard* and *Bernadyn* did not overrule, or even mention, for example, Judge Karwacki's decision in *Best v. State* or the impressive body of nationwide caselaw represented by *Best v. State.*

The *Garner* Court, *id.* at 149–50, 960 A.2d 649, then addressed the Court of Appeals decision in *Fields,* 395 Md. 758, 912 A.2d 637:

The issue was . . . cleanly joined. It would have been hard to drive a wedge between the circumstantial nature of the evidence in *Fields* and the circumstantial nature of the evidence in *Bernadyn.* There was no impediment to the deciding of the case on the issue for which *certiorari* had been granted. The decision in the case was filed on December 8, 2006, one year to the day after *Stoddard* and *Bernadyn* had been handed down. *Fields,* 395 Md. 758, 912 A.2d 637. After a routine recitation of the facts of the case and of its procedural history, the Court based its decision on a not particularly certworthy alternative ground. . . .

In the wake of *Fields,* only an automaton could refrain from asking, "Why?" We would have to be blind not to conclude that something was in ferment behind the scenes; and that it was something other than a ringing endorsement of *Stoddard* and *Bernadyn.* Perhaps the energy that fueled the *Stoddard* and *Bernadyn* decisions a year ago has to some greater or lesser extent cooled. We are not suggesting for a moment that we would not follow the express and literal holdings of *Stoddard* and *Bernadyn.* We are simply pointing out that, in order to decide this case, we have to read the tea leaves. Reading those auguries, we are not persuaded to give *Stoddard* and *Bernadyn* a liberal or expansive interpretation.

The Court of Appeals granted *certiorari* review and upheld this Court's decision. *Garner v. State,* 414 Md. 372, 995 A.2d 694 (2010). The Court stated that "neither *Stoddard* nor *Bernadyn* presented the issue of whether the 'verbal part of an act' is subject to exclusion under the rule against hearsay, or the issue of whether the rule against hearsay is applicable to every out-of-court declaration that constitutes circumstantial evidence of the declarant's state of mind." *Id.* at 381, 995 A.2d 694.

The Court cited to this Court's decision below, *Garner,* 183 Md.App. at 140, 960 A.2d 649, where we stated:

> The making of a wager or the purchase of a drug, legally or illegally, is a form of contract. *Little v. State,* 204 Md. 518, 522–23 [105 A.2d 501] (1954). There is an offer and an acceptance. The telephoned words of the would-be bettor or would-be purchaser are frequently categorized, therefore, as verbal parts of acts. They are not considered to be assertions and do not fall under the scrutiny of the Rules Against Hearsay.

*Garner,* 414 Md. at 382, 995 A.2d 694.

The Court stated that it "agree[s] with that analysis, which is entirely consistent with the prior opinions of this Court." *Id.* at 382, 995 A.2d 694.

After finding the testimony admissible as the "verbal part of an act," the Court considered whether the statement made an "implied assertion." It stated, *id.* at 388, 995 A.2d 694:

> While there may be an "implied assertion" in almost any question, in the case at bar, the only assertion implied in the anonymous caller's question was the assertion that the caller had the funds to purchase the drugs that he wanted to purchase. Because the caller's request did not constitute inadmissible hearsay evidence, the rule against hearsay does not operate to exclude evidence of the "verbal act" that established a consequential fact: Petitioner was in possession of a telephone called by a person who requested to purchase cocaine.

After *Garner,* we decided *Carpenter v. State,* 196 Md.App. 212 (2010). In that case, when the victim was robbed of his wallet he picked up a cell phone dropped by Carpenter, one of the robbers. *Id.* at 217. Carpenter called the cell phone to set up an exchange of the cell phone for the wallet. When he went to make the exchange and after returning the cell phone, the victim was shot. *Id.*

At trial, a detective testified that "he seized the cell phone from Carpenter during Carpenter's arrest." *Id.* at 219. Over the defense's objection, the detective testified to the times when calls were received by the cell phone and to the names and phone numbers from which those calls were made as stored in the cell phone's call history. *Id.* at 219–21.

On appeal, Carpenter contended that "the court 'erred and abused its discretion' in admitting [the detective's] testimony" because it " 'violated the rules against the admission of hearsay.' " *Id.* at 221.

The *Carpenter* Court reviewed this Court's decision in *Fields,* which it found "instructive," *id.* at 222, and "reached a similar conclusion," *id.* at 224. The Court stated, *id.* at 224–25:

> The prosecutor did not attempt to use [the detective's] testimony to show that a known declarant believed that Carpenter made the calls to the cell phone, had reason to accurately hold that belief, or was impliedly asserting that factual proposition. The probative value of the evidence that Carpenter's home phone number, Skinner's name, and Chase's phone number were stored in Carpenter's cell phone did not depend upon the belief of the person who called, or upon the accuracy of that person's belief. In fact, like in *Fields,* "there was no evidence about that person's belief, because the person was not identified." *Id.* at 37 [895 A.2d 339]. Because the prosecutor argued only that the cell phone belonged to Carpenter and that calls were made to the cell phone from phones belonging to Carpenter, Skinner, and Chase, the calls missed and received by the cell phone were not assertions, statements as defined by

Rule 5–801(a), or hearsay as defined by Rule 5–801(c). Hence, the court did not err in admitting Detective Orellano's testimony regarding the calls.

As in *Garner,* the *Carpenter* Court concluded that the evidence offered were not "assertions." However, as in *Fields,* the *Carpenter* Court considered how the prosecutor attempted to use the evidence, *i.e.* what the evidence was offered to prove, in considering whether an assertion was made.

With this background, we conclude that the paycheck was correctly admitted. Though we have found no Maryland case that definitively addresses the issue, the United States Supreme Court, in *Williams v. United States,* 458 U.S. 279, 284, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982) (superceded by statute on issue of fraud, *see, e.g. United States v. Celesia,* 945 F.2d 756, 758 (4th Cir.Va.1991)), considered whether the deposit of a bad check constituted a "false statement." It held that it did not because "[t]echnically speaking, a check is not a factual assertion at all, and therefore cannot be characterized as 'true' or 'false.' " *Id.*

Applying *Williams,* the United States Court of Appeals for the District of Columbia Circuit, in *United States v. Davis,* 596 F.3d 852, 857 (D.C.Cir.2010), stated: "Just as a check is not a 'statement' that can falsely influence federally insured lending institutions, *see Williams v. United States,* 458 U.S. 279, 284–85, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982), neither is a money order a 'statement' as defined by Rule 801(a)."

The *Davis* Court explained, *id.* at 856–57:

Davis is correct that like checks, money orders are not hearsay. They are legally operative documents with a meaning independent of the truth of the words they display. *See* 30B M. GRAHAM, FEDERAL PRACTICE AND PROCEDURE: EVIDENCE § 7005, at 46 n. 2 (2006); *see also United States v. Pang,* 362 F.3d 1187, 1192 (9th Cir. 2004) (collecting citations). As "verbal acts," their significance "lies solely in the fact that [they were] made, [so] no issue is raised as to the truth of anything asserted." FED.

R. EVID. 801(c) advisory committee's note. A $100 money order made out to The Hartford instructs a financial institution to disburse $100 to The Hartford. It would make no sense to ask whether the money order was true. Such an "instruction is, by its nature, neither true nor false and thus cannot be offered for its truth." *United States v. Shepherd,* 739 F.2d 510, 514 (10th Cir.1984).

*See also United States v. Pang,* 362 F.3d 1187, 1192 (9th Cir.Cal.2004) ("Checks fall squarely in this category of legally-operative verbal acts that are not barred by the hearsay rule.").

Also, the Federal Rules of Evidence Rule 801(c) advisory committee's note explains:

If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay. *Emich Motors Corp. v. General Motors Corp.,* 181 F.2d 70 (7th Cir.1950), *rev'd on other grounds* 340 U.S. 558, 71 S.Ct. 408, 95 L.Ed. 534 [ (1951) ], letters of complaint from customers offered as a reason for cancellation of dealer's franchise, to rebut contention that franchise was revoked for refusal to finance sales through affiliated finance company. The effect is to exclude from hearsay the entire category of "verbal acts" and "verbal parts of an act," in which the statement itself affects the legal rights of the parties or is a circumstance bearing on conduct affecting their rights.

Recognizing some murkiness in the precedential landscape, but, treating the writing on the check as a verbal part of the act of issuing the check, we are persuaded that the check was merely circumstantial non-assertive crime scene evidence. Though the recent date of the paycheck was emphasized, the date on which appellant was paid was not a contested issue in the case. The contents of the check, including the date, were not relevant to the crime with which appellant was charged. Its relevance was that its presence supported an inference that appellant, who happened to be the

payee of the check, had recently accessed the console and was therefore aware of its contents.

Viewing the check as a "verbal act" and applying the analysis of the Court of Appeals in *Garner*, 414 Md. at 382, 995 A.2d 694, we are persuaded that the paycheck is non-hearsay. In this analysis, we recognize that the *Garner* Court also considered whether, by his question, the anonymous caller made an implied assertion. *Id.* at 388, 995 A.2d 694. In considering whether the declarant of the contents of the paycheck impliedly asserted any relevant fact not explicit on its face, we conclude that the only assertions implied by the paycheck are that the City owed, or believed it owed, a named employee wages for a period worked, and that the Payroll Division had, or believed it had, the funds in its account to cover the check for those wages. The paycheck was not offered to prove the truth of any of these implied assertions, and, in our view, was properly admitted.

**JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED; COSTS TO BE PAID BY APPELLANT.**